# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### June 5, 2008 Session

## DENNIS PYLANT v. STATE OF TENNESSEE

**Appeal by permission from the Court of Criminal Appeals**
**Circuit Court for Cheatham County**
**No. 13469      Robert Burch, Judge**

---

**No. M2005-02721-SC-R11-PC - Filed September 25, 2008**

---

We accepted this appeal to determine whether the post-conviction court erred in denying Petitioner Dennis Pylant's claim of ineffective assistance of counsel at trial. In 2001, a jury convicted Petitioner of the first degree felony murder of two-year-old S.J.D. in the perpetration of aggravated child abuse. The Court of Criminal Appeals affirmed Petitioner's conviction and this Court denied Petitioner's application for permission to appeal. Petitioner filed a petition for post-conviction relief alleging ineffective assistance of counsel at trial. At the hearing, Petitioner adduced testimony about self-incriminating statements made by the victim's mother but which trial counsel did not present to the jury at trial. The post-conviction court struck this testimony as hearsay and denied Petitioner's claim for relief. The Court of Criminal Appeals affirmed the post-conviction court. We hold that the post-conviction court erred in striking the proffered testimony as hearsay. We also hold that, because the post-conviction court made no credibility findings with respect to the proffered witnesses, we are unable to reach the merits of Petitioner's claim. Accordingly, we reverse the Court of Criminal Appeals' judgment in this case and remand for a new post-conviction hearing.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Reversed; Remanded**

CORNELIA A. CLARK, J., delivered the opinion of the court, in which WILLIAM M. BARKER, C.J., and JANICE M. HOLDER, GARY R. WADE, and WILLIAM C. KOCH, JR., JJ., joined.

Eric S. Cartee and Paul Bruno (oral argument) Nashville, Tennessee, for the appellant, Dennis Pylant.

Robert E. Cooper, Jr., Attorney General & Reporter; Michael E. Moore, Solicitor General; J. Ross Dyer, Senior Counsel; Dan M. Alsobrooks, District Attorney General; and Robert S. Wilson, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

Petitioner claims that he received ineffective assistance of counsel during his trial for the first degree felony murder of two-year-old S.J.D.[1] ("the victim") and that he is therefore entitled to a new trial. To place this matter in context, it is necessary to understand the underlying facts elicited at Petitioner's trial.

*Proof at Trial*

The proof adduced during the State's case-in-chief established that in September 1999, Petitioner and Amanda Davis shared a mobile home in Cheatham County. Also living in the home were Petitioner's seven-year-old daughter, R.P., and Ms. Davis' two children, the victim and five-month-old J.D.[2] Although the record is unclear, the testimony suggested that Ms. Davis was a "live-in" babysitter to R.P.

R.P. testified that she arrived home from school on the afternoon of September 23, 1999, at approximately 3:30. As she entered the home, she saw Ms. Davis and the victim on the couch. She testified to seeing Ms. Davis "beating" the victim with a cooking spoon. She testified that she saw Ms. Davis beat the victim with the spoon four times and that Ms. Davis was striking the victim on his back.

According to Petitioner,[3] Ms. Davis had a 4:00 appointment on that same afternoon. In order for Ms. Davis to keep the appointment, Petitioner left work early to baby-sit R.P., J.D., and the victim. Petitioner arrived home to relieve Ms. Davis at approximately 3:30 p.m or 4:00 p.m.

R.P. testified that she and Ms. Davis were sitting at the kitchen table and the victim was in the living room when Petitioner came home. The victim began to cry when he discovered that Ms. Davis was leaving. R.P. testified that Ms. Davis became angry at the victim and "snatched [him] up by the arms and put him to bed." Ms. Davis left at approximately 4:00 p.m. The victim continued to cry after Ms. Davis left for her appointment and was still crying at approximately 4:30 p.m. At this time, Petitioner went to change his diaper. While sitting in the living room, R.P. heard noises coming from the victim's bedroom that sounded like Petitioner spanking the victim. After hearing two spanking noises, R.P. went to see what the noises were. As she looked into the victim's bedroom, she saw Petitioner spank the victim twice.

---

[1] To protect the anonymity of the minor children, we refer to them by their initials.

[2] Neither the victim nor J.D. is related to Petitioner.

[3] Petitioner did not testify at trial. Instead, Petitioner's statements were ascertained from the testimony of Sergeant Floyd Duncan, Jr., an investigator with the Criminal Investigation Division. Sergeant Duncan interviewed Petitioner on September 24, 1999.

R.P. testified that she saw Petitioner holding the victim up with one hand and spanking him with the other hand. She testified that Petitioner was holding the victim up by his arms but that the victim's feet were touching the ground. She testified that she saw Petitioner spank the victim's buttocks and that the victim was wearing a diaper

According to Petitioner's statements, he left the victim in the victim's bedroom. At approximately 5:30 p.m., Ms. Davis returned home from her appointment. By this time, the victim had stopped crying. Neither Ms. Davis nor Petitioner checked on the victim the rest of the night. At approximately 9:30 the next morning, Ms. Davis, unable to wake the victim, implored a neighbor to call 9-1-1.

Sean Greer, an officer with the Cheatham County Sheriff's Office, testified that he and two EMS paramedics arrived at Petitioner's home at approximately 10:00 a.m. After the victim was examined and pronounced dead, Officer Greer established a crime scene. Sergeant Floyd Duncan, Jr., an investigator with the Criminal Investigation Division, was called to examine the scene. Sergeant Duncan testified that he observed the victim lying on his left side as if he were asleep and that the victim was "cold and rigid to the touch." He noted that there was no visible bleeding, but the victim did have "sputum or vomit" around his mouth. Sergeant Duncan photographed the scene[4] and then questioned Ms. Davis. During the course of their conversation, Ms. Davis explained to Sergeant Duncan that the victim suffered from low blood sugar and sometimes would refuse to eat. Therefore, Sergeant Duncan's initial belief was that the victim's medical complications caused his death.

Dr. Charles Harlan, the State's Chief Medical Examiner,[5] performed an autopsy on the victim. The autopsy revealed that the victim had "two lacerations of the gastric mesentery, 100% laceration disruption of the root of the mesentery, splanchnic vasoconstriction of the ileum; and hemoperitoneum of 520 cc., which is about one and a third pints of blood in the abdomen." Based on these findings, Dr. Harlan testified that the victim bled to death.

Pursuant to his autopsy findings, Dr. Harlan estimated that death occurred two to twelve hours after injury. Dr. Harlan observed that the victim had reddish contusions on "the back of his abdomen."[6] Dr. Harlan opined that the injuries were caused by one to three blows to the victim's body with a cylindrical object such as a pin, a rod, a baseball bat, a lead pipe, the edge of a hand, or fingers. Dr. Harlan further explained that three open hand blows to the victim's back could have caused the mesentery tear. He acknowledged that a "light balsam wooden type spoon" could

---

[4] Sergeant Duncan testified at trial that his photos were subsequently lost by Wal-Mart's photo processing lab. The photos were never recovered.

[5] Dr. Harlan was the Chief Medical Examiner at the time of the trial in this matter but not at the time of the post-conviction hearing.

[6] Dr. Harlan testified that "[t]he abdomen is that portion of the trunk which extends from the diaphragm down to where the legs attach."

conceivably have caused the wounds if the spoon was applied with enough force, but Dr. Harlan opined that the wounds were more consistent with a blow from a hand.  Dr. Harlan clarified, however, that three open hand blows to the victim's buttocks would not have caused the fatal injuries.  Finally, Dr. Harlan conceded that he was unsure of the victim's exact time of death; but, he explained that the victim's body was rigid upon its discovery at 9:30 a.m. and that rigor mortis sets in approximately six hours after death.

The defense called no witnesses to testify.  Instead, as defense proof, trial counsel[7] entered into evidence: (1) the presentment charging Ms. Davis with the felony murder of the victim; (2) Ms. Davis' plea of nolo contendere to child neglect, a class D felony; and (3) the judgment of conviction against Ms. Davis reflecting that she received a four-year sentence.  During closing argument, trial counsel argued that it was Ms. Davis, not Petitioner, who caused the victim's death.

After deliberating, the jury found Petitioner guilty of first degree felony murder during the perpetration of aggravated child abuse.  The trial court subsequently sentenced Petitioner to life imprisonment.[8]

### Post-Conviction Proceeding

Petitioner timely filed a *pro se* post-conviction petition on March 29, 2004.  After counsel was appointed, Petitioner filed an amended petition, alleging that his trial counsel were ineffective because they:  (1) failed to call witnesses in support of the defense theory that Ms. Davis, and not Petitioner, was responsible for the injuries that caused the victim's death; and (2) failed to hire or otherwise obtain a forensic expert to attack Dr. Harlan's testimony.[9]  See Tenn. Code Ann. § 40-30-106(d) (2006).

At the post-conviction hearing, Petitioner proffered the testimony of twelve witnesses.[10] Petitioner first called Dr. Bruce Levy, the State of Tennessee's Chief Medical Examiner[11] and an expert in the area of forensic pathology.  Prior to testifying, Dr. Levy reviewed Dr. Harlan's autopsy report and trial testimony, as well as other forensic evidence relevant to Petitioner's case.  Dr. Levy testified that he disagreed with Dr. Harlan's conclusions that the injuries to the victim were caused by "a blow or blows to the back."  Instead, Dr. Levy opined that while the autopsy clearly demonstrated injuries to the mesentery, a blow to the back could not cause such an injury.  As Dr.

---

[7] Petitioner was represented by two attorneys at trial.

[8] The State sought neither the death penalty nor life imprisonment without the possibility of parole.

[9] Petitioner initially alleged other grounds in support of his ineffective assistance of counsel claim.  However, those grounds are not at issue in this appeal.

[10] Two of Petitioner's witnesses, Brent Spurlock and Teresa Portillo, offered testimony irrelevant to the questions raised on appeal.  Therefore, discussion of their testimonies is omitted.

[11] Dr. Levy succeeded Dr. Harlan as the State's Chief Medical Examiner.

Levy explained, "when we see this type of injury[,] it is typically caused by a crushing blow from the front. A blow is struck in the front, crushes the mesentery which is a fairly soft structure up against the front of the back bone." Dr. Levy further explained, "[t]he back is a very well protected area; and would not cause the injury that [Dr. Harlan] observe[d] at the autopsy." Dr. Levy also explained that if he had been called to testify at the trial, his testimony would have been the same.

On cross-examination, Dr. Levy admitted that it is possible for a blow to the back to tear the mesentery. Further, Dr. Levy agreed that the reddish marks that Dr. Harlan found on the victim's back could have been made by the palm of a hand. Dr. Levy testified that, if the victim squirmed during the blows, the victim could have been hit in the stomach, causing the mesentery to tear. Finally, Dr. Levy explained that he thought the victim would have bled out in less than twelve hours, the amount of time provided by Dr. Harlan. Based on a review of Dr. Harlan's notes, Dr. Levy testified that he "would expect the bleeding out to occur within more of a two to four hour than a two to twelve hour period."

On redirect, Dr. Levy explained that for a back blow to crush the mesentery, the mesentery would have to be crushed up against the front of the back bone. "A blow to the back could do that if the abdomen is supported in some way that pushes the abdomen in and causes that crushing injury." Specifically, when asked whether the mesentery could be torn with a blow to the back as by Petitioner holding the victim up with one hand and whipping him with the other, Dr. Levy stated, "[i]n that scenerio, I don't see how [a back blow] could cause [the tear]." Dr. Levy also testified that the cylindrical marks found on the victim could have been made by a wooden spoon.

On recross-examination, however, Dr. Levy testified that a light-weight, wooden spoon "could never generate enough force . . . to cause that kind of injury." Finally, when asked what symptoms the victim would have experienced as he was bleeding to death, Dr. Levy explained that as the blood collected in the victim's abdomen, it would have been very painful. "At a certain point enough blood is lost that the person is going to go into shock, begin to lose consciousness and then after that the person will die." When asked how long it would take in this instance from the time of the blows until "going into shock," Dr. Levy estimated about three hours.[12]

Lyla Defosio, Petitioner's grandmother, testified over objection.[13] Ms. Defosio recollected that after Ms. Davis testified at the preliminary hearing, she overheard Ms. Davis tell her attorney, "I know I beat him but I didn't aim to kill him; but I know I did." Ms. Defosio testified that she told trial counsel of this admission, and she would have testified to Ms. Davis' admission had she been called as a witness at trial. Ms. Defosio also testified that she was present at trial and wanted to

---

[12] Based on the facts presented to the trial court, if Ms. Davis administered the fatal blow or blows, the victim would have gone into shock at approximately 6:30 p.m. If Petitioner administered the fatal blow or blows, the victim would have gone into shock approximately one hour later at 7:30 p.m.

[13] The State objected to the testimony of several of Petitioner's witnesses, arguing that their testimony was hearsay. Each objection was overruled during the hearing.

testify.

On cross-examination, the State attacked Ms. Defosio's recollection of Ms. Davis' admission by illustrating that Ms. Defosio could not have heard the admission where she said she heard it and that the admission could not have happened on the day Ms. Defosio recalled. When further questioned about where she heard Ms. Davis' admission, Ms. Defosio explained that she gets confused in new buildings and could be mistaken as to where she heard the admission. On redirect examination, Ms. Defosio further explained that she gets confused concerning dates, but that she clearly remembered Ms. Davis making the statement.

The next witness, Leroy Binkley, Petitioner's neighbor, testified that he observed Ms. Davis burning "small bed sheets" and "kids['] clothes" on the afternoon of the day that the victim was found dead. He testified that he told Petitioner's family, trial counsel, and John Holder of the Cheatham County Sheriff's Department about the incident. Mr. Binkley testified that he was contacted by trial counsel and the evidence showed that he was subpoenaed for trial. Mr. Binkley also testified that he was present at trial and was willing to testify. Finally, he stated that, if called to testify at trial, he would have testified to the same facts.

On cross-examination, the State attempted to attack Mr. Binkley's credibility by: (1) demonstrating that he was "on jury duty on the day of this trial" and thus could not have been, as he testified, present at Petitioner's trial;[14] and (2) questioning him about his use of drugs. Mr. Binkley denied being on jury duty and vigorously denied "smoking dope."

Petitioner next called Trina Jackson, a co-worker of Ms. Davis. Ms. Jackson testified that on one occasion she saw Ms. Davis "holding [the victim] up with arm [sic] and whipping him with the other hand." She further explained that while the victim was being whipped, "his feet were like off the ground." Ms. Jackson also testified that she overheard Ms. Davis talking on the telephone while at work after the victim's death. Ms. Jackson testified that Ms. Davis said "she couldn't live with herself knowing that she had killed [the victim]." Ms. Jackson testified that she was subpoenaed for trial but did not remember speaking to trial counsel about the two incidents.

On cross-examination, Ms. Jackson testified that she told Petitioner about the whipping she had observed and that Petitioner's family was present when Ms. Davis whipped the victim. Ms. Jackson also testified that she told Petitioner and Petitioner's father about Ms. Davis' telephone conversation.

Sheila Pylant Wilson, Petitioner's sister, testified that after Petitioner was arrested, Ms. Davis told her that "she had made a deal to get her [other] son back and she was going to lie and do whatever it took to get [J.D.] back." Mrs. Wilson recalled, "She said she was going to lie and do and say anything she had to, to make sure that she got [J.D.] back even if [Petitioner] went to jail." Although Mrs. Wilson could not recall the date, she testified that Donald Pylant, father of Petitioner

---

[14] This Court notes that the trial in this matter lasted three days.

and Mrs. Wilson, and Dorothy Mills, Donald Pylant's ex-wife, were present when Ms. Davis made the statement.

Mrs. Wilson further testified that she witnessed Ms. Davis "punch" the victim in the back, and she had observed Ms. Davis hitting the victim on more than one occasion. Mrs. Wilson testified that she confronted Ms. Davis about hitting the victim, and Ms. Davis' response was: "He won't quit crying; and he was just a brat." Moreover, over objection, Mrs. Wilson testified that she heard Ms. Davis say that if the victim was not around, she and Petitioner would have the perfect family.

Mrs. Wilson testified that she received a subpoena to testify at trial and that she was interviewed "somewhat" by trial co-counsel prior to trial. She also testified that trial co-counsel asked if she would be willing to lie. When she responded in the negative, Mrs. Wilson testified that trial co-counsel "had nothing more to talk to [her] about." Finally, Mrs. Wilson testified that, if called as a witness at trial, she would have testified to the same facts.

Lloyd Harris, a bail bondsman, testified that, after Petitioner was arrested and had contacted him about his bond, he interviewed Ms. Davis. Mr. Harris testified that "[b]efore I make a bond, I usually question them pretty good; and people that knows [sic] them [and] that are involved in it." Mr. Harris testified, over objection, that Ms. Davis stated that Petitioner "had nothing to do with [the murder]" and that "[h]e didn't even touch that child." Mr. Harris stated that he was never contacted by trial counsel but that he had informed Petitioner of Ms. Davis' statements. He further testified that he did not receive a subpoena to testify. Mr. Harris agreed that had he been called to testify, he would have testified in the same way. Finally, on redirect examination, Mr. Harris stated that Ms. Davis said "she was the only one involved in it[;] [t]hat she done it."

Donald Pylant, Petitioner's father, testified that, on the night of Petitioner's arrest, he went to Petitioner's home and saw Ms. Davis. She told him, "I'm the one that did this; but I'm going to have to put the blame off on [Petitioner] if I can where I can try to keep my other baby." Mr. Pylant testified that his ex-wife, Dorothy Mills, and his daughter, Mrs. Wilson, were present when Ms. Davis made this statement. Mr. Pylant further testified that Ms. Davis made a second, similar statement after the first preliminary hearing.[15] Mr. Pylant explained that Ms. Mills was also present when Ms. Davis made the second statement and that an altercation between Ms. Davis and Ms. Mills ensued after the statement was made. Mr. Pylant testified that he told trial counsel of Ms. Davis' statements prior to trial but he did not receive a subpoena to testify.

Mr. Pylant also testified that lead trial counsel sent him a letter requesting $10,000.00 "or [trial counsel] couldn't properly represent [Petitioner] because [lead trial counsel] needed to hire his own investigator and medical examiner." Mr. Pylant testified that he was unable to send trial counsel the requested money but instead sent lead trial counsel the names of witnesses who he

---

[15] There were two preliminary hearings in this matter because of a recording system malfunction at the first hearing.

believed would testify favorably to Petitioner's case, including Jimmy Anderson,[16] Trina Jackson and Lyla Defosio.

Mr. Pylant was also questioned about his involvement in his son's case. Mr. Pylant testified that he was present at each meeting between Petitioner and trial counsel. Mr. Pylant testified that he never heard trial counsel discuss the felony murder doctrine or the elements of first degree felony murder and aggravated child abuse. Moreover, he testified that trial counsel discussed Petitioner's charge as being first degree murder. Mr. Pylant testified, over objection, that lead trial counsel told Petitioner that the State "don't [sic] have a first degree murder case on you" and that the State would have to prove premeditation. Mr. Pylant further testified, over objection, that lead trial counsel stated at the conclusion of trial, "I'll either do the appeal for you free or I'll sign papers right now that I didn't properly represent [Petitioner]."

On cross-examination, Mr. Pylant stated that trial counsel did not discuss with Petitioner either the Tennessee Pattern Jury Instructions or the elements of first degree felony murder. Mr. Pylant testified that he encouraged Petitioner not to accept any plea agreements offered by the State. Mr. Pylant also offered testimony that supported Lyla Defosio's testimony that she heard Ms. Davis make statements about her involvement in the victim's death.

Maya Pylant, Petitioner's wife,[17] testified that, had she been called as a witness, she would have testified that Petitioner was "really good with kids" and that she had "never seen him be verbally or physically abusive to a child." Additionally, Mrs. Pylant testified that, before Petitioner's trial, Ms. Davis followed her and Petitioner to a laundromat where Ms. Davis threatened Petitioner. Mrs. Pylant recalled Ms. Davis stating that if Petitioner did not leave the state with her, "she was going to tell on him – even though she knew that he didn't do it." Finally, Mrs. Pylant testified that she did not receive a subpoena to testify and was not present at the trial, but she could have been had she been subpoenaed.

Dorothy Mills, Donald Pylant's ex-wife, testified that she witnessed Ms. Davis throw the victim into a car "from the passenger's side to the driver's side." Ms. Mills also testified that, after the first preliminary hearing, she heard Ms. Davis say that she had killed the victim but "was going to put it off on [Petitioner]." Ms. Mills further explained that after Ms. Davis made the statement, she and Ms. Davis became embroiled in a fight that led to Ms. Mills' arrest.[18] Ms. Mills testified that she told trial counsel of both incidents. Finally, Ms. Mills testified that she could not remember whether she was subpoenaed at trial but that she would have testified at trial if she had been called as a witness.

---

[16] Mr. Anderson did not testify at the post-conviction hearing. Petitioner's post-conviction counsel testified that they had been unable to locate Mr. Anderson. Mr. Pylant, however, testified that Mr. Anderson was at the trial every day, sitting in the witness room ready to testify. Mr. Anderson was never called at trial.

[17] Although the record does not reflect the exact date of their marriage, Mrs. Pylant and Petitioner were not married at the time of the victim's death.

[18] Ms. Mills was charged with assault, but the charges were later dismissed.

Petitioner testified that he provided lead trial counsel with a list of "at least twenty" potential witnesses, including Maya Pylant, Trina Jackson, Dorothy Mills, Teresa Porillo, June Hargrove,[19] Leroy Binkley, and Lloyd Harris. Petitioner stated that trial counsel refused to subpoena some of the witnesses and that trial counsel refused to take depositions of some of the witnesses, including Maya Pylant. Petitioner further testified that trial counsel subpoenaed twelve witnesses but when he asked which twelve, lead trial counsel refused to name them stating "he was not going to discuss courtroom strategy."

Petitioner also testified that he remembered seeing a letter from lead trial counsel requesting an additional $10,000.00 so that he could be represented properly. He testified that he was unable to raise the money needed for trial counsel to hire an investigator and a medical expert. Petitioner further testified that, prior to trial, he had never heard of being declared indigent.

Petitioner also testified that lead trial counsel informed him that the State would have to prove that the killing was willful, deliberate, and premeditated. Moreover, Petitioner testified that he and trial counsel discussed possible plea agreements, including "five years probation" and "three years at thirty percent." Petitioner testified that he went to lead trial counsel's office to discuss the plea bargain and lead trial counsel informed him that "the state does not have what it takes to convict [you] of first degree murder." Petitioner also stated that lead trial counsel suggested that he "ask for all or nothing." Petitioner explained that lead trial counsel told him that the State could not prove murder and if they got an all or nothing charge, he would walk away with nothing. He further testified that, when he read the plea offer, he asked lead trial counsel why it said "felony first degree murder." Petitioner testified that trial counsel responded: "[W]hat did you think this was a misdemeanor charge[?]" Also regarding the State's plea offer, Petitioner testified that he told lead trial counsel he would sign the agreement if it reflected a plea of "no contest or best interest." Finally, Petitioner testified that, if he had known that lead trial counsel was not going to call the witnesses he provided or that "a judge must instruct the jury on all lesser included offenses," then he would have accepted the State's offer and agreed to a sentence of three years at thirty percent.[20]

When questioned about the charges filed against him, Petitioner testified that he did not learn about the felony murder doctrine until he read about it in the prison law library, but he did admit he heard lead trial counsel discussing aggravated child abuse during closing arguments. He also testified that he did not receive a copy of the indictment and was, therefore, not aware that he had been charged with felony murder. He testified that lead trial counsel did not explain that, to prove felony murder, the State "only needed to prove an inlaying [sic] felony to convict [him]."

---

[19] Although unclear, the record suggests that Ms. Hargrove is Ms. Davis' maternal grandmother.

[20] Both Petitioner and lead trial counsel testified that the State plea agreement offer was three years at thirty percent. The Notice of Proposed Plea Agreement and Declination of Same, apparently prepared by Petitioner's trial counsel, indicates in its typed portion that the State offered Petitioner the opportunity to plead guilty to reckless homicide and be sentenced to four years, with manner of service to be determined by the trial court. In the same agreement, however, the number "4" is struck through, and the number "3" written in along with words that are illegible. The record is unclear in this regard. Copies of any plea agreements offered by the State are not included in the record.

On cross-examination, Petitioner testified that lead trial counsel, and not his father, persuaded him to reject the plea offer. Petitioner reiterated that at no point before or during the trial did he know that he was charged with "felony murder," but he did admit that he heard the term during trial. Petitioner explained, however, that he thought felony murder referred to the fact that every murder is a felony. Petitioner agreed that, at one point before trial, lead trial counsel encouraged Petitioner to "take the deal" because "they are willing to knock it down to reckless homicide."

Petitioner further insisted that he told trial counsel to call Ms. Davis as a witness, but that both lead counsel and co-counsel did not want to call her to testify. Petitioner said that he did not testify at trial because trial counsel encouraged him not to. Had he testified, Petitioner stated that he would have explained that the "noise" R.P. heard was not him whipping the victim but instead was him clapping his hands to get the victim's attention when he entered the victim's bedroom. He stated that R.P. saw him help the victim to his feet after changing his diaper and saw him "pat [the victim] on the butt."

The State called lead trial counsel as its only witness. Lead trial counsel explained his habit and custom when dealing with felony murder cases. He explained that it is his practice to send a copy of every pleading to the client and that he was sure that he sent a copy of the indictment to Petitioner. Lead trial counsel also explained that he reviewed "the warrants"[21] with Petitioner and that Petitioner was aware that he was charged with felony murder. Lead trial counsel further explained that, without a doubt, when the plea bargain was offered he went over first degree felony murder with Petitioner and explained what the State had to prove.

Lead trial counsel explained that when the plea agreement was offered, he and Petitioner talked about the agreement and "the pros and cons of taking it versus going to trial." Lead trial counsel further explained that "we went over felony murder – I'm almost one hundred percent positive I took the Tennessee Pattern Jury Instruction" and explained the charges.

Lead trial counsel testified that, after Petitioner rejected the plea bargain, he filed numerous motions leading up to trial, including one requesting that no lesser-included offenses be charged to the jury. Lead trial counsel explained that his strategy of "going all or nothing" was based in part on a "case out of Massachusetts."

Lead trial counsel testified that he had originally wanted to hire an independent medical expert to pinpoint the victim's time of death, but after talking with Dr. Harlan, he learned that the time of death could not be conclusively pinpointed. Thus, he decided that a defense expert was not needed because there "wasn't a dispute about the manner of death." Moreover, lead trial counsel explained that after meeting with Dr. Harlan for more than six hours prior to trial, he was convinced that Dr. Harlan's testimony could support the theory that Ms. Davis, and not Petitioner, had actually supplied the blow that killed the victim.

---

[21] It is unclear from the record why lead trial counsel reviewed "the warrants" with Petitioner since an indictment was issued in this case.

Lead trial counsel next testified that "[a]ny witness [Petitioner] would have told me about specifically that he even had a fact of the case, we would have interviewed or called." Lead trial counsel testified that he and co-counsel met with Petitioner and "voted" on whether to call Ms. Davis as a witness. Lead trial counsel testified that he "voted to call her" because he had a "wealth of cross-examination information about her" and could use prior bad acts to impeach her; however, Petitioner and co-counsel, who had no previous jury trial experience, out-voted him. Based on this "vote by committee," Ms. Davis was not called at trial. Instead, lead trial counsel attempted to get in prior bad acts of Ms. Davis through other witnesses, like the victim's biological father. However, the trial court refused to allow such testimony, unless and until Ms. Davis testified.[22]

On cross-examination, lead trial counsel testified that he was unsure whether he provided Petitioner with a copy of the indictment and warrant but specifically remembered going over the elements of first degree felony murder with Petitioner. Lead trial counsel explained that he did not call many of Petitioner's offered witnesses because, in his determination, they did not have much to offer. Moreover, lead trial counsel testified that Petitioner did not insist on any particular witnesses testifying.

Lead trial counsel further testified that the "whole theory of the case" was that Ms. Davis killed the victim. He admitted that he was aware of her prior inconsistent statements and prior bad acts, but he defended the decision not to call her, saying it was a "vote by committee." Lead trial counsel continued to assert, however, that he had wanted to call Ms. Davis.

On redirect examination, lead trial counsel denied discouraging Petitioner from taking the plea offer. He reiterated that Petitioner's potential witnesses "had no relevant or probative value whatsoever." He also testified that he acquiesced to Petitioner's wish not to call Ms. Davis and that the decision was trial strategy.

At the close of all testimony, the State moved to strike as hearsay the testimony of all witnesses who claimed to have heard Ms. Davis make statements admitting her culpability in the victim's death. Petitioner opposed the State's motion. The post-conviction court informed the parties that it would decide the issue in its written opinion.

---

[22] During the cross-examination of the victim's father at trial, lead trial counsel attempted to question him about Ms. Davis' previous acts, including whether Ms. Davis: "made up a charge against [Mr. Davis] for domestic violence"; lied under oath; and lied on an order of protection. The State objected to this line of questioning. In a jury-out proceeding, the trial court sustained the State's objection, stating:

> The person on trial here today is [Petitioner]. [Ms. Davis] is not on trial. You're wanting me to let you impeach a witness before she ever testifies? I can't do that . . . .
> 
> . . .
> 
> I'm not going to let you [impeach Ms. Davis] until the issue comes – right now her credibility is not even an issue in this court and your [sic] trying to attack it.

*Procedure Below*

The post-conviction court issued its memorandum decision four months after the hearing. In its opinion, the court first addressed the State's motion to strike the testimony characterized by the State as hearsay. The court determined that Ms. Davis' alleged statements were not admissible under Tennessee Rule of Evidence 804(b) as statements against penal interest unless Ms. Davis was unavailable to testify at the post-conviction hearing. The court concluded that Petitioner failed to show she was unavailable[23] and therefore granted the State's motion to strike all of the testimony concerning any confession or admission by Ms. Davis.

The court then considered Petitioner's claim of ineffective assistance of counsel in light of the remaining proof and concluded that Petitioner failed to demonstrate that he had been prejudiced by any of trial counsel's alleged deficiencies. Accordingly, the court denied the petition for post-conviction relief. The Court of Criminal Appeals affirmed the trial court's decision with one judge dissenting. Petitioner timely filed an application for permission to appeal.

We granted Petitioner's application for permission to appeal to determine whether the post-conviction court erred in: (1) striking as hearsay the testimony of certain witnesses; (2) granting the State's motion to strike without a hearing; (3) concluding that Petitioner's trial counsel was not ineffective for failing to properly investigate and present key witnesses at trial; and (4) concluding that Petitioner's trial counsel was not ineffective in failing to retain a forensic expert prior to trial.

**Standard of Review**

This Court is bound by a post-conviction court's findings of fact unless the preponderance of the evidence is otherwise. Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006). Our review of legal issues or mixed questions of law and fact, such as a claim of ineffective assistance of counsel, however, is de novo with no presumption of correctness. Finch v. State, 226 S.W.3d 307, 315 (Tenn. 2007). At the same time, questions concerning the admissibility of evidence generally are reviewed under an abuse of discretion standard. See, e.g., State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008).

**Analysis**

*Ineffective Assistance of Counsel*

Both the Sixth Amendment to the United States Constitution[24] and article I, section 9 of the Tennessee Constitution guarantee a criminally accused the right to representation by counsel.

---

[23] Indeed, the court stated in its order that "the proof establishes that she was available." It is unclear, however, to what proof the post-conviction court was referring.

[24] The Sixth Amendment is applicable to the States through the Fourteenth Amendment. See State v. Howell, 868 S.W.2d 238, 251 (Tenn. 1993).

Additionally, both the United States Supreme Court and this Court have recognized that the right to such representation encompasses the right to "reasonably effective" assistance, that is, assistance "within the range of competence demanded of attorneys in criminal cases." Strickland v. Washington, 466 U.S. 668, 687 (1984); see Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975).

A claim of ineffective assistance of counsel is a claim cognizable under Tennessee's Post-Conviction Act. See Tenn. Code Ann. §§ 40-30-101 to -313 (2006). A petitioner for post-conviction relief has "the burden of proving the allegations of fact by clear and convincing evidence." Id. § 40-30-110(f). In order to prevail on a claim of ineffective assistance of counsel, the petitioner must establish both that his lawyer's performance was deficient and that the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 687, and Baxter, 523 S.W.2d at 936). To prove deficient performance, the petitioner must demonstrate that his lawyer's conduct fell below an objective standard of "reasonableness under prevailing professional norms." Vaughn, 202 S.W.3d at 116 (quoting Strickland, 466 U.S. at 688). As we have stated previously,

> the assistance of counsel required under the Sixth Amendment is counsel reasonably likely to render and rendering reasonably effective assistance. It is a violation of this standard for defense counsel to deprive a criminal defendant of a substantial defense by his own ineffectiveness or incompetence. Defense counsel must perform at least as well as a lawyer with ordinary training and skill in the criminal law and must conscientiously protect his client's interest, undeflected by conflicting considerations.

Baxter, 523 S.W.2d at 934-35 (quoting Beasley v. United States, 491 F.2d 687, 696 (6th Cir. 1974)). "Defense counsel must investigate all apparently substantial defenses available to the defendant and must assert them in a proper and timely manner." Id. at 935. Moreover, this Court has noted that "the adversary system requires that 'all available defenses are raised' so that the government is put to its proof." Baxter, 523 S.W.2d at 933 (quoting United States v. DeCoster, 487 F.2d 1197, 1204 (D.C. Cir. 1973)). And if counsel's choices not to raise substantial defenses are professionally unreasonable "considering all the circumstances," counsel's performance is deficient. See Strickland, 466 U.S. at 688.

To prove that counsel's deficient performance prejudiced the defense, the petitioner "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." Vaughn, 202 S.W.3d at 116 (citing Strickland, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome. State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999). A reasonable probability of being found guilty of a lesser charge, or receiving a shorter sentence, satisfies the second prong of Strickland. See State v. Zimmerman, 823 S.W.2d 220, 224 (Tenn. Crim. App. 1991).

## A. Deficient Performance

### 1. Failure to Call Witnesses at Trial

The main thrust of Petitioner's claim of ineffective assistance of counsel is that trial counsel failed to put before the jury proof that Ms. Davis killed the victim. Petitioner contends that trial counsel had available two sources of proof about Ms. Davis' culpability: Ms. Davis herself and other persons who heard Ms. Davis make incriminating statements. He argues that trial counsel was deficient in failing to call these witnesses at trial and that this failure resulted in prejudice. In support of his claim, Petitioner called Ms. Defosio, Ms. Jackson, Mrs. Wilson, Mr. Harris, Mr. Pylant, and Ms. Mills to testify at the post-conviction hearing about inculpatory statements they heard Ms. Davis make. Petitioner did not call Ms. Davis to testify at the post-conviction hearing.

To succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing. Black v. State, 794 S.W.2d. 752, 757 (Tenn. Crim. App. 1990). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." Id.

When a petitioner presents at the post-conviction hearing a witness he claims should have been called at trial, the post-conviction court must determine whether the testimony would have been (1) admissible at trial and (2) material to the defense. See McAlpin v. State, No. M2004-03043-CCA-R3-PC, 2005 WL 2453983, at *8 (Tenn. Crim App. Oct. 5, 2005) (stating that even if the evidence proffered at the post-conviction hearing were "admissible [at trial] under any exception to the rule against hearsay," the evidence was "neither so favorable nor so material as to warrant post-conviction relief"); King v. State, No. 01C01-9603-CR-00086, 1997 WL 311923, at *3 (Tenn. Crim. App. June 6, 1997) (stating that facts known by missing witnesses did "not make the witnesses material, or that, if produced, their testimony would have been relevant and, therefore, admissible"); cf. Newsome v. State, 995 S.W.2d 129, 135 (Tenn. Crim. App. 1998) (stating that a court, when addressing a petition for writ of error *coram nobis* on the basis of newly discovered evidence, must find "that the newly discovered evidence may have resulted in a different judgment had it been presented at the trial," and that this "rule presupposes that the evidence would be admissible pursuant to the applicable rules of evidence and is material to the issues or grounds raised in the petition"). If the post-conviction court determines that the proffered testimony would not have been admissible at trial *or* that, even if admissible, it would not have materially aided the petitioner's defense at trial, the post-conviction court is justified in finding that trial counsel was not deficient in failing to call that witness at trial. Finally, if the proffered testimony is both admissible and material, the post-conviction court must assess whether the witness is credible. See State v. Young, 196 S.W.3d 85, 107 (Tenn. 2006) (stating that the credibility of the witnesses is resolved by the trier of fact); State v. Dych, 227 S.W.3d 21, 40 (Tenn. Crim. App. 2006) (stating that "[a]ll questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts").

Here, the post-conviction court made none of these assessments with respect to the proffered proof of Ms. Davis' incriminating statements because it determined that the proof was inadmissible hearsay at the post-conviction hearing.[25] We now review that decision.

## 2. Hearsay Ruling

As set forth above, Petitioner called Ms. Defosio, Ms. Jackson, Mrs. Wilson, Mr. Harris, Mr. Pylant, and Ms. Mills to testify about inculpatory statements they claimed to have heard Ms. Davis make. The post-conviction court subsequently struck and refused to consider "all of the testimony concerning any confession or admission by Amanda Davis" on the basis that it was inadmissible hearsay.

Initially, questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere in the absence of abuse appearing on the face of the record. State v. Dotson, 254 S.W.3d 378, 392 (Tenn. 2008); see State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997); State v. Van Tran, 864 S.W.2d 465, 477 (Tenn. 1993); State v. Harris, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." State v. Ruiz, 204 S.W.3d 772, 778 (Tenn. 2006) (citing Howell v. State, 185 S.W.3d 319, 337 (Tenn. 2006)).

In this case, the post-conviction court's refusal to consider "the testimony concerning any confession or admission by Amanda Davis" on the basis that the testimony was inadmissible hearsay was illogical, unreasonable and caused an injustice to Petitioner because the statements were being offered, not to prove the truth of the matter asserted but instead, to show that Petitioner received ineffective assistance of counsel. This illogical and unreasonable application of the hearsay doctrine caused an injustice to Petitioner because this testimony was essential to his claim of ineffective assistance of counsel.

Tennessee Rule of Evidence 801(c) defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove *the truth of the matter asserted*." (Emphasis added). Although this definition appears straightforward, many statements can be offered to prove more than one thing. For instance, if a police officer testifies that the victim told him, "Mr. Jones shot me," the statement is hearsay if it is offered to prove that Mr. Jones was the shooter. However, if this statement is offered to prove that the police officer had probable cause to arrest Mr. Jones, the statement is not hearsay because it is not being offered for the truth of the matter asserted. Instead, the statement is offered to show the reason for the police officer's arrest of Mr. Jones.

In this case, Petitioner was offering the testimony of Ms. Defosio, Ms. Jackson, Mrs. Wilson, Mr. Harris, Mr. Pylant, and Ms. Mills *not* for the truth of the matter asserted–that Ms. Davis was

---

[25] We disagree, therefore, with the State's assertion in its brief to this Court that "the post-conviction court made clear that it found none of [Petitioner's] witnesses to be credible."

-15-

responsible for the victim's death–but rather to demonstrate that trial counsel was deficient in not calling these witnesses at trial. As noted by Judge Witt in his dissent below, "the statements were offered to show that [Petitioner's] trial attorneys were on notice and had knowledge of the various witnesses' accounts of Ms. Davis's statements. Thus, the evidentiary significance of the statements lies in the indication that trial counsel knew of potentially exculpatory evidence." Pylant v. State, No. M2005-02721-CCA-R3-PC, 2007 WL 1890178, at *13 (Tenn. Crim. App. June 29, 2007) (Witt, J., dissenting). Accordingly, the testimony was not hearsay for the purposes of the post-conviction hearing. The post-conviction court therefore erred in striking this testimony as hearsay and, in doing so, abused its discretion.[26]

### 3. Admissibility of Stricken Testimony at Trial

Our conclusion that the post-conviction court erred in striking this testimony does not end our inquiry. As set forth above, the stricken testimony supports Petitioner's claim of deficient performance only if this evidence would have been admissible at trial.

The testimony at issue centered around statements allegedly made by Ms. Davis which implicated her in the victim's death. At trial, these statements would have been offered to prove the truth of the matter asserted: that Ms. Davis, not Petitioner, was responsible for the victim's death. Accordingly, at trial, these statements would have been properly characterized as hearsay.

Generally, hearsay statements are not admissible. Tenn. R. Evid. 802. Hearsay statements may be admitted if they qualify as one or more of the enumerated hearsay exceptions. See Tenn. R. Evid. 803, 804. One of these exceptions is for a statement "which . . . at the time of its making . . . so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Tenn. R. Evid. 804(b)(3). Proof of a statement against penal interest, however, is not admissible under this

---

[26] In his dissent, Judge Witt, citing Russell v. Crutchfield, 988 S.W.2d 168, 170 (Tenn. Ct. App. 1998), advocates for review of the post-conviction court's rulings on whether the proffered testimony was hearsay under a de novo standard of review. Pylant, 2007 WL 1890178, at *12 (Witt, J., dissenting). As Judge Witt has previously noted,

[On being presented with a hearsay objection, a] trial court's first duty is to determine whether the out-of-court declarant's statement is hearsay–that is, whether it is "offered in evidence to prove the truth of the matter asserted." *No factual issue attends this determination, and it necessarily is a question of law.* If the statement is offered to prove the truth of the matter asserted and no exceptions apply, the statement is, purely and simply, inadmissible. At this juncture, the court has no discretion to hold otherwise, and to utilize an abuse of discretion standard at this point in the analysis "'would have us defer to a discretion that the trial court does not possess.'" State v. Edison, 9 S.W.3d 75, 78 (Tenn. 1999) (quoting State v. Edison, No. 03C01-9605-CC-00199, 1997 WL 1526501, at *8 (Tenn. Crim. App. June 18, 1997) (Tipton, J., concurring)).

State v. Gilley, No. M2006-02600-CCA-R3-CD, 2008 WL 3451007, at *16 (Tenn. Crim. App. Aug. 18, 2008) (citations omitted) (emphasis added). Although this Court continues to believe that questions concerning the admissibility of evidence are reviewed under an abuse of discretion standard, we note that, in this instance, the post-conviction court committed error under either standard of review.

exception to the hearsay rule unless the proponent of the proof demonstrates that the declarant is unavailable. Tenn. R. Evid. 804(b). In the context of a criminal trial, a declarant is unavailable if she: (1) "[i]s exempted by ruling of the court on grounds of privilege from testifying"; (2) refuses to testify despite a court order; (3) "[d]emonstrates a lack of memory"; (4) "[i]s unable to be present or to testify at the hearing because of . . . death or then existing physical or mental illness or infirmity"; or (5) is absent from the hearing because of the inability to procure her attendance by process. Tenn. R. Evid. 804(a).

The declarant of each of the statements in question is Ms. Davis. Had trial counsel called her to the witness stand at trial, she could have done one of three things. First, in response to questions about her responsibility for the victim's death, she could have refused to answer pursuant to her Fifth Amendment privilege against self-incrimination.[27] See Dotson, 254 S.W.3d at 392 & n.11. In that event, the trial court could have declared her exempt from testifying and she would have been deemed unavailable for purposes of Tennessee Rule of Evidence 804(a)(1). Id. Petitioner's witnesses could then have testified about her out-of-court statements pursuant to Tennessee Rule of Evidence 804(b)(3). See id. Second, Ms. Davis could have responded by denying any involvement in the victim's death and denying that she had ever made any inculpatory statements. In that event, Petitioner's witnesses could have testified about Ms. Davis' alleged statements in order to impeach her credibility. See Tenn. R. Evid. 613(b). Third, Ms. Davis could have admitted to having made the inculpatory statements. In that event, the other witnesses' testimony about those statements would have been inadmissible hearsay. However, Ms. Davis' own admissions then would have been helpful to Petitioner's case.

Because Ms. Davis did not testify at the post-conviction hearing, we do not know how she would have responded had she been called to testify at trial. However, under any of the three scenarios discussed above, trial counsel could have presented to the jury proof about Ms. Davis' inculpatory statements either directly through Ms. Davis or through Ms. Defosio, Ms. Jackson, Mrs. Wilson, Mr. Harris, Mr. Pylant, and Ms. Mills.

In its brief to this Court, the State argues that "petitioner's failure to produce Ms. Davis during his post-conviction hearing precludes a finding that he was prejudiced by her absence at trial" and therefore obviates his claim of ineffective assistance of counsel. The State relies on Black for the proposition that, to succeed on a claim of ineffective assistance of counsel for failure to call a witness at trial, a post-conviction petitioner should present that witness at the post-conviction hearing. 794 S.W.2d. at 757. "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of *critical evidence* which inured to the prejudice of the petitioner." Id. (emphasis added). This case does not fit the "general rule," however, because Petitioner presented the "critical evidence" of

---

[27] Ms. Davis was originally indicted along with Petitioner for the first degree felony murder of the victim. Her subsequent guilty plea to child neglect may have rendered problematic any later attempt to invoke the Fifth Amendment. See Floyd v. Prime Succession of TN, No. E2006-01085-COA-R9-CV, 2007 WL 2297810, at *7 (Tenn. Ct. App. Aug. 13, 2007). Regardless, we recognize that whether she would have been legally entitled to refuse to testify at Petitioner's trial, she may have done so, even if facing a finding of contempt.

-17-

Ms. Davis' alleged inculpatory statements through other witnesses–an acceptable alternative strategy under the unique circumstances of this case given the very real possibility that Ms. Davis would refuse to testify to any such admissions and/or her alleged culpability in the victim's death. We emphasize, however, that post-conviction counsel generally risks the denial of a post-conviction claim if he or she fails to call at the post-conviction hearing *all* witnesses who they claim should have been called at trial.

### 4. Materiality of Stricken Testimony at Trial

Even if admissible at trial, the proof of Ms. Davis' inculpatory statements that Petitioner could have adduced at trial is of no avail to his claim of trial counsel's deficient performance unless that testimony was material to his defense. Here, the significance of the stricken testimony was that Ms. Davis was responsible for the victim's death, not Petitioner. The materiality of this proof to Petitioner's defense at trial, therefore, is clear.

### 5. Failure to Call Amanda Davis

We have determined that trial counsel could have put on proof at trial that Ms. Davis incriminated herself in the victim's death. In order to do so, however, trial counsel had to elicit Ms. Davis' testimony at trial or demonstrate that she was unavailable. As set forth above, Petitioner would not have been able to put Ms. Defosio, Ms. Jackson, Mrs. Wilson, Mr. Harris, Mr. Pylant, and Ms. Mills on the stand at trial unless and until Ms. Davis denied having made the inculpatory statements or was unavailable to testify.

At the post-conviction hearing, lead trial counsel testified that he had wanted to call Ms. Davis to testify at trial because he had a "wealth of cross-examination information about her" and "prior bad acts."[28] Instead of relying on his professional judgment, however, lead trial counsel put the decision of whether to call Ms. Davis to a vote among himself, co-counsel–who had no previous jury trial experience–and Petitioner. When co-counsel and Petitioner "voted" not to call Ms. Davis to the witness stand, lead trial counsel acquiesced.

Contrary to what lead counsel stated, Petitioner testified that he wanted Ms. Davis put on the witness stand at trial. Significantly, the post-conviction court did not make a credibility finding on this crucial issue. Moreover, the State did not call trial co-counsel to testify at the post-conviction hearing. Therefore, the reasons why trial co-counsel desired not to call Ms. Davis are unknown. Generally, "[w]hen counsel, retained or appointed, is challenged as ineffective and a [post-conviction] hearing is held, the state should present the attacked counsel to show what occurred." Garrett v. State, 530 S.W.2d 98, 99 (Tenn. Crim. App. 1975).

With respect to placing the determination of whether to call a key witness to a "vote" in which the defendant has an equal say, we emphasize that, "[s]trategic and tactical decisions should

---

[28] We note that our Rules of Evidence severely limit the extent to which a witness' prior bad acts may be used at trial. See Tenn. R. Evid. 404(b), 608(b).

be made by defense counsel after consultation with the client . . . . Such decisions include what witnesses to call, whether and how to conduct cross-examination, . . . and what evidence should be introduced." A.B.A. Standards for Criminal Justice § 4-5.2(b) (3d ed. 1993); see id. § 4-5.2 cmt. (stating that "[b]ecause these decisions require the skill, training, and experience of the advocate, the power of decision on them should rest with the lawyer" and that the lawyer should maintain "the ultimate choice and responsibility for the strategic and tactical decisions in the case"); see also Baxter, 523 S.W.2d at 936 (stating that "[t]rial courts and defense counsel should look to and be guided by the American Bar Association's Standards relating to the Administration of Criminal Justice in general, and specifically to those portions of the Standards which relate to the Defense Function [chapter 4]"). We therefore question the extent to which lead trial counsel's "determination" to not call Ms. Davis can be characterized as "strategic" or "tactical."[29] In any event, by making this "decision," trial counsel foreclosed the possibility of calling Ms. Defosio, Ms. Jackson, Mrs. Wilson, Mr. Harris, Mr. Pylant, and Ms. Mills to testify about incriminating statements they heard Ms. Davis make. Thus, in not calling Ms. Davis to the witness stand, trial counsel disabled Petitioner from adducing material and admissible evidence in favor of his defense at trial.

As we have often repeated, this Court will not second-guess trial counsel's informed tactical and strategic decisions. Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). On this point, however, we agree with Judge Witt's dissent below:

> [G]iven that counsel admitted in the post-conviction hearing that the defense theory at trial was that Ms. Davis killed the victim, trial counsel's failure to subpoena and utilize an available Ms. Davis at trial or, alternatively, to establish that she was unavailable to testify at trial, strongly suggests that counsel's performance was not within the range of competence demanded of attorneys in criminal cases. . . . Lead trial counsel testified at the post-conviction hearing that he did not call Ms. Davis as a witness at trial because he was out-voted by co-counsel and [Petitioner]. I would reject outright this explanation as a basis for an *informed tactical and strategic decision*.

Pylant, 2007 WL 1890178, at *14 ( Witt, J., dissenting). Accordingly, we conclude that Petitioner has established that lead trial counsel performed deficiently in his method of "deciding" not to call Ms. Davis to the stand at trial.

## B. Prejudice

Of course, even if Petitioner has established that his legal representation at trial was deficient because it deprived him of proof about Ms. Davis' alleged inculpatory statements, that deficiency

---

[29] The American Bar Association Standards for the Defense Function also states that "[i]f a disagreement on significant matters of tactics or strategy arises between defense counsel and the client, defense counsel should make a record of the circumstances, counsel's advise and reasons, and the conclusion reached." A.B.A. Standards for Criminal Justice § 4-5.2(c). If such a record was made, it does not appear in the record.

does not entitle Petitioner to post-conviction relief unless Petitioner has demonstrated that the deficient performance resulted in prejudice. See Vaughn, 202 S.W.3d at 116. As set forth above, the test for prejudice on a claim of ineffective assistance of counsel is "whether there is a reasonable probability that, absent [counsel's unprofessional] errors, the factfinder would have had a reasonable doubt respecting guilt." Strickland, 466 U.S. at 695. "A reasonable probability is a probability sufficient to undermine confidence in the outcome," id. at 694, and "a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would *reasonably likely* have been different absent the errors," id. at 696 (emphasis added).

Because the post-conviction court struck all extrinsic proof about Ms. Davis' incriminating statements and because Ms. Davis did not testify at the post-conviction hearing, the court never considered whether trial counsel's failure to call Ms. Davis at trial (and, depending upon her response, the witnesses Petitioner proffered at the post-conviction hearing) resulted in prejudice to Petitioner. We, too, are prevented from reaching this issue. Although we have determined that proof of Ms. Davis' alleged inculpatory statements was material to Petitioner's defense and would have been admissible at trial, we do not have the benefit of any findings by the post-conviction court that the witnesses who offered this proof were credible. It is the role and function of a trial court to make credibility findings and this Court will not usurp that power. Dych, 227 S.W.3d at 40. We find it significant, however, that lead trial counsel never testified that he did not call Ms. Defosio, Ms. Jackson, Mrs. Wilson, Mr. Harris, Mr. Pylant, and Ms. Mills to the stand because he did not believe them. Rather, he testified that he did not call Petitioner's witnesses at trial because, according to his analysis of Petitioner's case, they "had no relevant or probative value whatsoever."

We are constrained, therefore, to reverse the Court of Criminal Appeals' judgment and remand for a new post-conviction hearing. At the new post-conviction hearing, the post-conviction court must assess the credibility of those witnesses who proffer testimony material and admissible at trial. Assuming Petitioner's proof includes testimony about Ms. Davis' statements, the post-conviction court must then assess whether the *absence* at trial of proof of Ms. Davis' inculpatory statements brings into doubt Petitioner's conviction. We emphasize, as did Judge Witt in the proceeding below, that the test for prejudice under Strickland is *not* an inquiry into the sufficiency of the State's evidence adduced at trial. Indeed, "[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." 466 U.S. at 694.[30]

---

[30] The post-conviction court erroneously described the prejudice prong of an ineffective assistance of counsel claim as requiring a petitioner to demonstrate that "but for his counsel's error the results of Petitioner's trial would have been different." No such certainty is required. See Vaughn, 202 S.W.3d at 116 (stating that the petitioner "must establish a *reasonable probability* that but for counsel's errors the result of the proceeding would have been different") (emphasis added).

Our conclusion that further proceedings are necessary in the post-conviction court renders unnecessary our resolution of the remaining issues Petitioner raised in this appeal.

## CONCLUSION

The post-conviction court erred in striking as hearsay the testimony of witnesses presented at the hearing and in failing to assess their credibility and the potential effect of their testimony on the outcome of Petitioner's trial. Without credibility findings, this Court is foreclosed from determining whether Petitioner received ineffective assistance of counsel at trial. Therefore, for the reasons stated above, we reverse the Court of Criminal Appeals' judgment and remand this case to the post-conviction court for a new hearing. It appearing that Petitioner is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
CORNELIA A. CLARK, JUSTICE