# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 14, 2015

## MAURICE EDWARD CARTER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Smith County**
**No. 07-CR-72    David Earl Durham, Judge**

_____

### No. M2014-00750-CCA-R3-PC - Filed March 3, 2015

_____

In December 2009, the Petitioner, Maurice Edward Carter, pled guilty to one count of aggravated statutory rape and one count of criminal exposure to HIV and received an effective sentence of 20 years. Pursuant to his plea agreement, the Petitioner reserved a certified question of law concerning the trial court's denial of his motions to suppress evidence and his statement. On direct appeal, this Court determined that the certified question was not dispositive of the Petitioner's case and dismissed the appeal. Thereafter, the Petitioner filed a post-conviction petition but was denied relief. The Petitioner now appeals, contending that he received ineffective assistance of counsel based upon trial counsel's failure to: (1) properly preserve the certified question of law; (2) adequately explain to the Petitioner the possible outcomes of his direct appeal; and (3) address in the certified question of law the issue of the legality of the officer's opening a locked box found in the Petitioner's vehicle. The Petitioner further contends that his guilty plea was unknowing and involuntary based upon trial counsel's ineffectiveness and the trial court's failure to ensure that the Petitioner understood the ramifications and possible outcomes of his appeal of a certified question of law. Following review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal  Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Comer L. Donnell, District Public Defender; Michael W. Taylor and William Cather, Assistant Public Defenders, Lebanon, Tennessee, for the appellant, Maurice Edward Carter.

Herbert H. Slatery, III, Attorney General and Reporter; Clarence E. Lutz, Senior Counsel; Tom P. Thompson, District Attorney General; and Howard Chambers, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I.  Facts and Procedural Background

In August 2007, the Smith County Grand Jury indicted the Petitioner on four counts of rape of a child, 14 counts of rape, one count of contributing to the delinquency of a minor, 20 counts of criminal exposure to HIV, one count of statutory rape, and three counts of sexual exploitation of a minor.  That same month, the Petitioner was indicted by the Rutherford County Grand Jury on three counts of statutory rape, three counts of criminal exposure to HIV, two counts of solicitation of a minor, and 10 counts of especially aggravated sexual exploitation of a minor.  All of the Petitioner's offenses involved the same victim, C.C.[1]

The Petitioner filed a motion to suppress evidence and motion to suppress his statement in both Smith and Rutherford Counties.  Thereafter, the trial courts from both counties conducted a joint hearing on the motions.  On direct appeal, this Court summarized the evidence from the hearing, as well as the trial courts' reasons for denying the motions to suppress:

> Deputy Steve Babcock with the Smith County Sheriff's Department testified that on June 2, 2007, he was dispatched to the end of Rome Road in the Riddleton community of Smith County because of a complaint of loud music. Deputy Babcock described that Rome Road ends at the edge of a river where a ferry used to transport vehicles across the river.  However, once the ferry ceased operations, the county put up a berm at the end of the road to keep vehicles from going into the river.  Deputy Babcock said that he frequently patrolled that location, generally going there at least once a night.
>
> Deputy Babcock testified that he arrived at the location shortly after midnight on June 3, and the sheriff and chief deputy also arrived at the same time.  He said that he did not have his onboard video camera on, nor did he or the other

---

[1] It is the policy of this Court to identify minor victims by their initials only.

officers have their blue patrol lights activated. Deputy Babcock noted that their patrol cars were parked in the road blocking the "[o]ne way in [and] one way out," but "if somebody wanted to leave they could have gone through the field where the Chief parked and got out."

At the scene, Deputy Babcock saw four vehicles "spread out in a pattern in an open area" approximately 100 feet from the berm. Three of the vehicles had two occupants each, while the fourth vehicle had only one occupant. He approached a Nissan automobile and saw the [Petitioner] and C.C. inside the vehicle. He noted that C.C. was sitting in the driver's seat and that the [Petitioner] was in the front passenger's seat. Deputy Babcock shined his flashlight into the car and observed a bag containing a green leafy substance, which he believed to be marijuana, along with rolling papers, next to the [Petitioner's] leg. Deputy Babcock requested that the [Petitioner] and C.C. step out of the car and asked C.C. who owned the marijuana. C.C. replied that the marijuana was his.

Deputy Babcock testified that he asked the [Petitioner] if he was the owner of the vehicle, and the [Petitioner] replied that he was. Deputy Babcock asked the [Petitioner] for consent to search his vehicle, and "[c]onsent was given. He said it was okay." Deputy Babcock then searched the car and found another bag of marijuana in the driver's side door. The deputy asked the [Petitioner] if the marijuana was his, and the [Petitioner] "started getting kind of heavy breathing, started sweating, saying he was having chest pains, started getting upset." Deputy Babcock asked the [Petitioner] if he needed an ambulance, and the [Petitioner] replied that he did, so Deputy Babcock called for an ambulance. Deputy Babcock stopped searching the vehicle and attended to the [Petitioner]. While they waited for the ambulance, the [Petitioner] was "[b]reathing heavy, sweating, . . ., kept bending over, standing up, bending over, standing up, like he was real nervous and upset."

After it became apparent that the [Petitioner] would be leaving in an ambulance, Deputy Babcock asked the [Petitioner] whom he wanted to have tow his car, and Deputy Babcock contacted that company. Before the [Petitioner] left in the ambulance, Deputy Babcock asked the [Petitioner] again for consent to search his vehicle and informed him that he had the opportunity to withdraw his earlier consent because he would not be at the scene for the search. The [Petitioner] again stated that "it was okay" to search his vehicle.

The [Petitioner] left the scene in an ambulance, and Deputies Maynard and Hale assisted Deputy Babcock in the continued search of the [Petitioner's] vehicle. In the backseat, a "new English dictionary" was found that contained nude photographs of C.C.

Deputy Ronnie Maynard with the Smith County Sheriff's Department testified that he responded to the scene at the end of Rome Road that night and assisted in searching the [Petitioner's] vehicle. Deputy Maynard found a locked box in the backseat and, when he shook it, he could tell that there was something inside. He "took [his] knife and it just opened right up." The box contained several photographs and DVDs. He showed the photographs to Deputy Babcock who identified C.C. as the individual in the photographs.

Deputy Scott Hale with the Smith County Sheriff's Department testified that he also responded to the scene at the end of Rome Road and assisted in searching the [Petitioner's] vehicle. Deputy Hale discovered two BB air pistols that were modified to look like real guns, but the items did not result in any charges being brought. Deputy Hale said that he did not have his blue patrol lights on when he arrived at the scene, nor did he have his onboard video camera activated. Deputy Hale did not see the blue patrol lights activated on any of the other patrol cars either.

In ruling on the [Petitioner's] motion to suppress the search of his vehicle, the Smith County trial court ruled that the marijuana was in plain sight in the [Petitioner's] vehicle and that the defendant gave consent to search his vehicle. The Rutherford County trial court likewise concluded that the marijuana was in plain sight and that the [Petitioner] consented to a search of his vehicle. That court also noted that because the [Petitioner's] vehicle was being towed, "an inventory search . . . likewise would further justify a search that was conducted in which the box or the dictionary book was found." The court summarized that the search, with regard to the book, was justified "incident to the finding of the substance which the officer believed to be a Class VI scheduled narcotic. Authorized also based upon the consent of the [Petitioner] to the search and then based upon the inventory of the vehicle upon the vehicle being towed."

After the judges' rulings on the [Petitioner's] motions to suppress the searches, the hearing continued and the [Petitioner] called several witnesses on a "Motion to Suppress the Stop."

-4-

Sheriff Ronnie Lankford testified that he received a call that several cars were at the end of Rome Road. He and his brother, Chief Deputy Lankford, and Deputy Babcock responded at the same time, each in his own patrol car. Two other officers arrived later, each in his own patrol car. Upon their arrival, they noticed several cars there and that someone had started a fire. Deputy Babcock and Chief Lankford "went on in between the vehicles," while Sheriff Lankford served as backup. Sheriff Lankford did not know who ordered everyone out of the vehicles and said it was Deputy Babcock's decision as to whether anyone was free to leave.

Chief Deputy William Lankford testified that he, Sheriff Lankford, and Deputy Babcock responded to the scene because "citizens in the community . . . had called the Sheriff's Office, disturbed about the vehicles being down in the bend [and] music playing[.]" When he arrived, Chief Deputy Lankford saw four vehicles, containing a total of six individuals, gathered at the ferry landing. He explained that he and the other officers went there to disperse the crowd. He believed that the people gathered at the end of the road were violating the law because "[g]athering on a public ramp like that after midnight, . . . causing concern for the safety of the community and putting other people in distress" was the violation. Chief Deputy Lankford approached the vehicle in which the [Petitioner] and C.C. were sitting and asked C.C. for a driver's license. Meanwhile, Deputy Babcock approached from the rear of the vehicle, "gazing in the vehicles as he came along with his flashlight, checking the crowd out with his flashlight," and asked C.C. if the marijuana on the console belonged to him. Chief Lankford said that he, however, had not seen anything on the console.

Chief Deputy Lankford stated that they never told anyone that they were not free to leave. He recalled that Deputy Babcock asked the [Petitioner] and C.C. to exit their vehicle, but he did not ask any other persons to do so.

Thirty-year-old Christopher Saddler testified that he was present at the end of Rome Road the night the defendant and C.C. were arrested. He said that everyone was "just standing around talking and listening to music" when the police arrived. The music was playing from the [Petitioner's] car and the volume was "[i]n between" loud. Juveniles, some of whom were drinking beer, were present, and a fire was burning.

C.E. testified that he was present at the end of Rome Road on the night in question. He said that everyone was sitting around and talking, and they had

a fire burning. It was thirty minutes past his curfew, but there was no other violation of the law taking place. He stated that everyone had gotten into their cars and was "fixing to leave" when the officers arrived. C.E. knew that C.C. was driving and did not have a driver's license.

The [Petitioner] testified that he knew that the juveniles were out past their curfew and that someone had built a fire, but he said that everyone was just sitting around and listening to music. He was in his car when the officers arrived, and Chief Lankford told him to exit his car. Chief Lankford took his driver's license and began to question him, but he had done nothing illegal that night. He alleged that the officers' blue patrol lights were on.

On cross-examination, the [Petitioner] testified that he had driven his car that night, although C.C. was sitting in the driver's seat listening to music when the officers arrived. He did not know that C.C. was out past his curfew until the officers told him or that C.C. had marijuana in his possession. The [Petitioner] acknowledged that he had nude pictures of C.C. tucked into a dictionary box in the back seat of his car. When asked whether the pictures were against the law, the [Petitioner] replied, "I guess." On redirect examination, the [Petitioner] said that he did not give consent to search his car.

In ruling on the [Petitioner's] motion to suppress the "stop," the Smith County trial court ruled that "the law is pretty clear in searching a vehicle when something is in plain sight," implicitly accrediting Deputy Babcock's testimony. The court also found that opening the locked box was "incident to this search. You're allowed to look in to that because it would be a place that drugs could be located and contraband could be found." The Rutherford County trial court ruled on the Rutherford County motion that "[w]e would find likewise." Neither of the courts ruled upon the legality of the initial interaction between the [Petitioner] and the officers, or whether it occurred by a "stop" or otherwise.

After the courts' rulings on the motions to suppress the stop, the courts heard testimony concerning the [Petitioner's] motion to suppress his statement.

Agent Jason Wilkerson, a field agent for the Tennessee Bureau of Investigation (TBI), testified that he interviewed the [Petitioner] at approximately 8:00 a.m. on the date of the encounter. Agent Wilkerson read the waiver of rights form to the [Petitioner], and the [Petitioner] signed it. He observed that the [Petitioner] was alert and responsive during the questioning.

-6-

The [Petitioner] gave both recorded and written statements. He told Agent Wilkerson that he caught C.C. smoking when he was eleven or twelve years old and used that as leverage to take photographs of C.C. by threatening to tell C.C.'s grandmother that he had been smoking. The photographs "were of a sexual nature, . . . and then over a period of time it evolved from photographs to actual physical contact and sexual activity."

Agent Wilkerson explained that the charges in Rutherford County arose against the [Petitioner] because "the activity took place in Smith County as well as he had an apartment in Rutherford County." During the interview, Agent Wilkerson showed the [Petitioner] the approximately twenty photographs that had been found in his vehicle, and the [Petitioner] identified each photograph and the location of where the photograph was taken. Some of the sexual encounters took place at a church in Smith County, some took place at the [Petitioner's] apartment in Rutherford County, and some took place in a vehicle.

Agent Wilkerson stated that the [Petitioner] also executed forms giving consent to search his residence, his storage unit, and electronic devices. He said that the [Petitioner] never asked for an attorney, but at the end of the interview, before they started recording, he asked the [Petitioner] "in passing what he did specifically at the church that would allow him access into an office within the church, and his words were something to the effect that he didn't know if he needed representation . . . to answer that particular question." Agent Wilkerson said that he gestured to the rights form and said that they would get the [Petitioner] an attorney if he wanted one, but the [Petitioner] said, "[N]o, let's just proceed."

Detective Shannon Hunt with the Smith County Sheriff's Department testified that he was present when Agent Wilkerson advised the [Petitioner] of his rights and interviewed the [Petitioner]. Detective Hunt was also present when, "almost at the end of the interview, right before the actual electronic statement[,] [w]e [were] sitting there and he mentioned something about the Lilly Hill Baptist Church and he . . . kind of got offensive and . . . it went to possibly I might need an attorney to answer that." Detective Hunt said that Agent Wilkerson readvised the [Petitioner] of his rights and that an attorney would be provided if he wanted one, but the [Petitioner] "decided to answer questions."

On recross examination, Detective Hunt acknowledged that the transcript of the preliminary hearing reflected that Detective Hunt had answered, "Yes," to a question concerning whether the [Petitioner] had said that he needed an attorney, and he never indicated that the [Petitioner] said he "might" need an attorney.

The [Petitioner] testified that he asked for an attorney "at the beginning of the interrogation." He made the request after Agent Wilkerson "showed [him] the very first photograph," but Agent Wilkerson "went ballistic and . . . told [him] that this only makes [him] look like [a] pedophile and that if [he] g[o]t an attorney involved that it wouldn't go good for [him]." The [Petitioner] said that he started to have an anxiety attack and explained to Agent Wilkerson that he had not had his anti-anxiety medication.

On cross-examination, the [Petitioner] stated that he did not sign the waiver of his rights until after the initial interview. He said that Agent Wilkerson kept asking him questions, even after he asked for an attorney, to the point that he started having an anxiety attack. With regard to the consents to search his home, storage unit, and electronics, the [Petitioner] said that "[t]hey started throwing papers down in front of [him] . . . and . . . [he] was kind of intimidated by them and . . . just d[id] what they told [him]. [He] didn't know if they w[ere] going to take [him] to the back and beat [him] up or something."

Agent Wilkerson was recalled to testify that he did not do the things alleged by the [Petitioner]. Agent Wilkerson said that he clarified the [Petitioner's] statement regarding counsel and did not take it to be an unequivocal request for an attorney.

In denying the [Petitioner's] Smith County motion to suppress his statement, the Smith County trial court ruled that the officers followed the rules correctly and that the [Petitioner] decided to "go ahead with the waiver and answer the questions." The court discredited the [Petitioner's] testimony that Agent Wilkerson had "holler[ed] and yell[ed]" at him. The Rutherford County trial court ruled on the Rutherford County motion that the [Petitioner] made an equivocal statement regarding an attorney, Agent Wilkerson clarified the statement in accordance with the law, and Agent Wilkerson did not behave inappropriately as alleged by the [Petitioner].

State v. Maurice Edward Carter, No. M2010-00063-CCA-R3-CD, 2011 WL 3303714, at *1-6 (Tenn. Crim. App. Aug. 2, 2011), perm. to app. denied (Tenn. Nov. 15, 2011) (footnotes omitted).[2]

Following the hearing on the motions to suppress, the Petitioner pled guilty in the Smith County case to one count of aggravated statutory rape and one count of criminal exposure to HIV and received an effective sentence of 20 years. He also pled guilty in Rutherford County to four counts of aggravated sexual exploitation of a minor, two counts of solicitation of sexual exploitation of a minor, one count of statutory rape, and one count of criminal exposure to HIV and received an effective sentence of 20 years, which was ordered to run concurrently with his 20-year sentence from Smith County. As part of the Petitioner's plea agreements in both counties, the Petitioner reserved a certified question of law concerning the trial courts' denials of his motions to suppress. Specifically, the certified question read:

> Whether the stop and subsequent warrantless search of the [Petitioner's] Nissan automobile on June 3, 2007, by officers in Smith County, Tennessee, was unreasonable; violated the [Petitioner's] Fourth Amendment rights to the United States and Tennessee Constitutions; was performed without probable cause nor based upon a reasonable suspicion supported by articulable facts; was a pretext to perform an illegal search; was unreasonable in the time[,] manner and scope of the investigation; was done without lawful consent; and was unlawful. Whether the evidence obtained from the stop and subsequent warrantless search, including statements and evidence obtained from search warrants based on evidence from the search, were obtained unlawfully and subject to suppression and, if so, whether the trial court erred in failing to suppress the evidence and statements.

Maurice Edward Carter, 2011 WL 3303714, at *4.[3] On appeal, this Court determined that the certified question was not dispositive of the Petitioner's charges and dismissed the appeal

---

[2] The Petitioner subsequently filed a motion to reconsider in Smith County, following the death of Judge James O. Bond. In ruling on the motion to reconsider, the trial court incorporated the reasons stated by the courts that had previously reviewed the Petitioner's motions to suppress and ruled that the officer had probable cause to believe that he saw marijuana in the Petitioner's vehicle, making the search of the vehicle proper. In ruling on the motion to suppress the Petitioner's statement, the trial court concurred with the trial courts' reasoning at the initial hearing, finding that the Petitioner had received and waived his Miranda warnings.

[3] The Smith County and Rutherford County cases were consolidated before this Court for direct appeal.

for lack of jurisdiction. Id. at *1. The dismissal of the certified question was ultimately predicated on the fact that "[t]he certified question does not contemplate why the State could not proceed based upon the testimony of the juvenile victim." Id., at *11n.5.

Thereafter, the Petitioner filed a petition for post-conviction relief in Smith County, asserting that trial counsel was ineffective in reserving the certified question and bringing the appeal. The post-conviction court summarily dismissed the petition, finding that the issues had been previously determined on direct appeal. On appeal, this Court reversed the judgment of the post-conviction court and remanded the case for further proceedings. See Maurice Edward Carter v. State, No. M2012-01843-CCA-R3-PC, 2013 WL 3023093, at *1 (Tenn. Crim. App. June 14, 2013).

Following the appointment of counsel, the Petitioner filed an amended petition for post-conviction relief. At an evidentiary hearing on the petition, the Petitioner testified that he was represented at trial by attorneys Jamie Winkler and Jack Bellar. During the course of their representation, Mr. Winkler and Mr. Bellar spoke with the Petitioner numerous times about pretrial motions, their negotiations with the State, and possible defense strategies. Ultimately, the Petitioner entered a guilty plea, reserving a certified question of law as part of his plea agreement.

Regarding his guilty plea, the Petitioner testified that he understood he was "taking a conditional plea with the right to appeal a certified question" and that the question "would be dispositive" of his charges. Trial counsel explained to the Petitioner that the guilty plea reserved a certified question that could be raised in an appeal. Trial counsel also explained that the question was dispositive of the case because if the evidence from the lock box was thrown out, the State would have no case "except for simple possession of marijuana." The Petitioner recalled that Mr. Winkler and Mr. Bellar, as well as the trial court and the State's attorney, agreed that his certified question was in the proper form and dispositive of the case. The Petitioner testified that, despite trial counsels' assurances, the appellate court later determined that his certified question failed to clearly identify the scope and limits of the legal issue being reserved and failed to mention with specificity the legality of the search of the lock box. The Petitioner further testified that, while witnesses testified about the lock box at the hearing on the motions to suppress, trial counsel failed to have the trial courts make any specific ruling on the issue.

The Petitioner further testified that the option to reserve a certified question was "the main reason why [he] took the guilty plea." The Petitioner explained, "[H]ad I not been given that option, I never would have took [sic] the guilty plea." According to the Petitioner, on the day of his guilty plea, he asked Mr. Bellar about his chances on appeal, and Mr. Bellar responded, "[Y]ou have one in three shots that the Appellate Courts [will] rule in your

favor." The Petitioner denied that trial counsel explained to him that there was a possibility that the certified question could be rejected by the appellate court and the appeal dismissed. The Petitioner stated, "No one ever mentioned it in Mr. Bellar's office. No one ever mentioned it in open court. It's not in the record. It's not in the transcripts."

On cross-examination, the Petitioner was shown a letter from trial counsel that was addressed to him and dated December 7, 2009 ("December 7th letter")–the day of the Petitioner's guilty plea. The Petitioner acknowledged that his signature was on the bottom of the letter, but he denied ever seeing the letter. He testified:

> Like I said, if this letter was given to me, I have no knowledge of it. I'm not saying that it wasn't, but as I read this, this is the first time I'm reading all of this that's in this, and at no particular time had anyone went over this with me and sat down and discussed this. Of course it says, all parties believe the issue to be dispositive, but please understand that will be part of the Appellate Court's consideration and it could always disagree.

> At no point in any of our conversations had anyone discussed this with me. Had they discussed this with me, I never would have took [sic] the plea. I would have took [sic] a chance on a trial where I would have every issue to appeal. I would have had every opportunity to appeal every issue. The only reason why I took this plea was because Mr. Bellar assured me that we had an opportunity to get . . . the evidence suppressed.

Regarding the signature at the bottom of the December 7th letter, the Petitioner testified, "It is my signature. That could be copied and pasted, but that is my signature." The Petitioner maintained that he had never seen the letter before but agreed that the letter purported to inform him that the appellate court may not entertain his certified question.

Jamie Winkler testified that he had represented the Petitioner on the charges in both Smith and Rutherford Counties. He explained that he worked for Mr. Bellar and they were both involved in the negotiations with the State on the Petitioner's behalf. Regarding the certified question of law, Mr. Winkler testified that he spoke to the Petitioner "[n]umerous times" about the issue of the certified question. Mr. Winkler explained:

> We talked about that he could reserve a certified question under Rule 37. Went over the requirements for that, and we did explain to him on numerous occasions that there was certainly no guarantee of any appeal and that a Rule 37 question had to be accepted by the Court of Criminal Appeals.

-11-

Regarding the December 7th letter, Mr. Winkler testified that both he and Mr. Bellar drafted the letter in order to ensure that the Petitioner had a full understanding of what they had discussed with him over several days. The morning of the Petitioner's guilty plea, trial counsel met with the Petitioner at their office. They had a "fairly lengthy discussion" about the plea, and the Petitioner indicated his willingness to enter the plea under the terms they had discussed. At that time, trial counsel presented the December 7th letter to the Petitioner, and the Petitioner read and signed it. Mr. Winkler testified, "I saw him read it. I saw him sign it."

Mr. Winkler testified that he drafted the certified question, along with some assistance from Mr. Bellar. He explained that the issue of the lock box was covered in the motions to suppress and at the hearing on the motions, and he believed that the certified question, as worded, included the issue of the search of the lock box. Regarding the appellate court's opinion on direct appeal, Mr. Winkler testified that the court determined that the certified question was not dispositive of the case but he "respectfully disagree[d]" with the court. He explained that, from his perspective, the evidence obtained from the search of the Petitioner's car and lock box led to the Petitioner's statement, the victim's statement, and all of the other incriminating evidence against the Petitioner.

Following the release of the appellate court's opinion, Mr. Winkler visited the Petitioner and went over the opinion with him. Mr. Winkler and Mr. Bellar then filed an application for permission to appeal with the Tennessee Supreme Court, which was denied. Mr. Winkler testified that he never guaranteed the Petitioner that the certified question would be heard by the appellate court. He also denied that he forged the Petitioner's signature at the bottom of the December 7th letter.

Jack O. Bellar testified that he had practiced law for 52 years and that, along with Mr. Winkler, he represented the Petitioner on the charges in Smith and Rutherford Counties. Before the Petitioner's guilty plea, Mr. Bellar discussed with the Petitioner the specific requirements for a certified question under Rule 37. Mr. Bellar testified that he believed the issue of the lock box was addressed by the language of the certified question. Mr. Bellar told the Petitioner, however, that the certified question may or may not be heard by the appellate court. He documented his conversation with the Petitioner in the December 7th letter, which contained language that "the Court of Criminal Appeals may not agree that the question is dispositive." Regarding the December 7th letter, trial counsel testified that it was "[s]omething I seldom do, but I felt in this case, the gravity of all of it, we tried to explain a lot of this in writing to [the Petitioner] because he's highly intelligent, so there wouldn't be any misunderstanding about anything." Mr. Bellar went over the letter with the Petitioner, and he had the Petitioner sign the letter to verify that the Petitioner understood its contents. Mr. Bellar did not recall ever telling the Petitioner that he had a one in three shot at success on appeal.

At the conclusion of the hearing, the post-conviction court took the matter under advisement. The court then filed a written order dismissing the petition for post-conviction relief. The post-conviction court determined that the Petitioner had failed to establish by clear and convincing evidence that he would not have pled guilty absent the ability to appeal the certified question, stating, "The evidence, in fact, preponderates otherwise." In its findings of fact and conclusions of law, the post-conviction court noted that, by the Petitioner's own testimony, he believed there was a 67 percent chance that the appellate court would not rule in his favor and his conviction would stand. Nonetheless, the Petitioner still decided to plead guilty.

Regarding the issue of whether trial counsel informed the Petitioner that the appellate court could dismiss his certified question without reaching the merits, the court found:

> Two witnesses, each counsel for the Petitioner, both experienced and able trial lawyers, testified they never told Petitioner he had only a "one in three shot" for success in the Court of Criminal Appeals. However, they each testified they had extensive conversations with the Petitioner, and members of his family, that they would prepare and present the certified question to the trial court (which approved same), and the Appellate Court, but that the Appellate Court could simply reject the question without reaching the merits. The State introduced Exhibit No. 1 being a letter signed by counsel and the Petitioner which corroborates the testimony of the State's witnesses and contradicts the testimony of the Petitioner.

Regarding the Petitioner's claim that trial counsel failed to properly present and argue his claims in the motions to suppress, the post-conviction court likewise found that the Petitioner failed to meet his burden of proof on the issue.

Following the entry of the post-conviction court's order, the Petitioner filed this timely appeal.

## II. Analysis

Post-conviction relief is available only where the petitioner demonstrates that his or her "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2014). In order to prevail on a post-conviction claim, the petitioner must prove his or her allegations of fact by "clear and convincing evidence." Tenn. Code Ann. § 40-30-110(f) (2014); see Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). This

Court will not overturn a post-conviction court's findings of fact unless the evidence preponderates against the finding. Pylant v. State, 263 S.W.3d 854, 867 (Tenn. 2008); Sexton v. State, 151 S.W.3d 525, 531 (Tenn. Crim. App. 2004). We will defer to the post-conviction court's findings with respect to the witnesses' credibility, the weight and value of their testimony, and the resolution of factual issues presented by the evidence. Momon, 18 S.W.3d at 156. However, with respect to issues raising a mixed question of law and fact, including a claim of ineffective assistance of counsel, our review is *de novo* with no presumption of correctness. See Pylant, 263 S.W.3d at 867-68; Sexton, 151 S.W.3d at 531.

A. Ineffective Assistance of Counsel

The Petitioner contends that he is entitled to post-conviction relief because he received ineffective assistance of counsel in connection with the reservation of his certified question of law for appeal. He asserts that trial counsel failed to: (1) properly preserve the certified question of law; (2) adequately explain to the Petitioner the possible outcomes of his direct appeal; and (3) address in the certified question of law the issue of the legality of the officer's opening a locked box found in the Petitioner's vehicle.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove two factors: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. Strickland, 466 U.S. at 687; Henley, 960 S.W.2d at 580; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689; see also Henley, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. Granderson v. State, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the Strickland analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." Henley, 960 S.W.2d at 579 (citing Baxter v. Rose, 523

-14-

S.W.2d 930, 936 (Tenn. 1975)); see also Goad, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that the counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad, 938 S.W.2d at 369 (citing Strickland, 466 U.S. at 688); see also Baxter, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. Goad, 938 S.W.2d at 370. Therefore, under the second prong of the Strickland analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. (quoting Strickland, 466 U.S. at 694)(internal quotation marks omitted).

A substantially similar two-prong standard applies when the petitioner challenges counsel's performance in the context of a guilty plea. Hill v. Lockhart, 474 U.S.52, 58 (1985); Don Allen Rodgers v. State, No. W2011-00632-CCA-R3-PC, 2012 WL 1478764, at *4 (Tenn. Ct. Crim. App. April 26, 2012). First, the petitioner must show that counsel's performance fell below the objective standards of reasonableness and professional norms. See Hill, 474 U.S. at 58. Second, "in order to satisfy the 'prejudice' requirement, the [petitioner] must show that there is a reasonable probability that, but for counsel's errors, he would have not have pleaded guilty and would have insisted on going to trial." Id. at 59.

A post-conviction petition is the proper mechanism for challenging any purported deficiency in failing to preserve a certified question "[b]ecause the reasons a defendant pleads guilty may be varied, [and] it is not necessarily the case that the inducement to plead guilty is the ability to have a certified question considered on appeal." State v. Sigifredo Ruiz, No. M2000-03221-CCA-R3-CD, 2001 WL 1246397, at *4 (Tenn. Crim. App. Oct. 17, 2001), no Rule 11 app. filed. Counsel's failure to preserve an issue as a certified question is "not automatically the ineffective assistance of counsel" because "[a] guilty plea based upon the reasonably competent advice of counsel may not be attacked because of the possibility that the eventual outcome of an issue may have been favorable to the petitioner had he or she proceeded to trial." Eddie Lee Lowe v. State, No. W1999-00881-CCA-R3-PC, 2000 WL 1285333, at *7 (Tenn. Crim. App. Aug. 30, 2000), perm. to app. denied (Tenn. Apr. 9, 2001). Instead, a petitioner must show by clear and convincing evidence that he would not have pled guilty absent the ability to appeal the certified question. Id. If a petitioner is able to demonstrate both deficiency and prejudice in counsel's failure to properly present a certified question for review, the proper remedy is to vacate the judgment of conviction and allow the petitioner to withdraw the guilty plea. State v. Boyd, 51 S.W.3d 206, 211 (Tenn. Crim. App. 2000).

In this case, we agree with the post-conviction court that the Petitioner has failed to demonstrate any prejudice resulting from trial counsel's handling of his direct appeal. Mr. Winkler and Mr. Bellar testified that they informed the Petitioner before he entered his guilty pleas that the appellate court could determine the certified question was not dispositive of the charges against the Petitioner and dismiss the appeal. Moreover, they presented the December 7th letter to the Petitioner, which documented this advice, and the Petitioner signed the letter before entering his guilty pleas. The post-conviction court accredited Mr. Winkler's and Mr. Bellar's testimony and found that, despite knowing that the appellate court might not reach the merits of his appeal, the Petitioner persisted in his guilty pleas. Under these circumstances, we find that the Petitioner failed to establish that he would not have pled guilty absent the ability to appeal the certified question. As such, the Petitioner is not entitled to post-conviction relief based upon his claim of ineffective assistance of counsel.

B. Unknowing and Involuntary Guilty Plea

The Petitioner also contends that his guilty plea was unknowing and involuntary based upon the ineffectiveness of trial counsel and the trial court's failure to ensure that he understood the ramifications and possible outcomes of his guilty plea. We note that the issue of whether the Petitioner's guilty plea was knowing and voluntary was not raised in the amended petition and no such argument was made by the Petitioner at the post-conviction hearing. As a result, the issue was not considered by the post-conviction court. This Court will not consider post-conviction issues that are raised for the first time on appeal. See, e.g., Cone v. State, 747 S.W.2d 353, 356 (Tenn. Crim. App. 1987); see also Tenn. R. Crim. P. 36(a) (stating that "relief may not be granted in contravention of the province of the trier of fact"). As such, we conclude that the Petitioner has waived this issue.

### III.  Conclusion

For the aforementioned reasons, we affirm the judgment of the post-conviction court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE