IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs May 17, 2017

**DWAYNE WRIGHT v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 11-05627      W. Mark Ward, Judge**

_____

**No. W2016-01260-CCA-R3-PC**

_____

Petitioner, Dwayne Wright, was convicted of one count of aggravated rape and sentenced to twenty-four years in the Department of Correction. On appeal, this court affirmed his conviction and sentence. *State v. Dwayne Wright*, No. W2013-00433-CCA-R3-CD, 2014 WL 1168579 (Tenn. Crim. App. March 21, 2014). Petitioner filed a timely petition for post-conviction relief. Following a hearing on the petition, the post-conviction court denied relief. On appeal, Petitioner argues that he received ineffective assistance of counsel because trial counsel failed to call Eric Hulbert as a witness at trial. After a thorough review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROBERT W. WEDEMEYER, JJ., joined.

Eric Mogy, Memphis, Tennessee, for the appellant, Dwayne Wright.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy P. Weirich, District Attorney General; and Omar Malik, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Background*

The facts as set forth by this Court on direct appeal are as follows:

The victim testified that on the evening of April 9, 2002, she, her then-boyfriend, now husband, and her friend, Eva Lundahl, had dinner together at the home they shared. The group consumed a couple of

bottles of wine with their dinner. At some point during the evening, a friend called Ms. Lundahl, and they made plans to go and sing kar[a]oke at Alfred's on Beale Street. The victim decided to join them, but her boyfriend remained home with the victim's child. The group arrived at Alfred's around 10:00 p.m., with the victim wearing black pants, a black shirt, and ankle boots. Underneath her clothes, she wore a bra and pantyhose, but she did not wear panties.

Upon their arrival, the group sat at a table and ordered several alcoholic beverages. More people they knew joined them, and the group continued to drink and began dancing together. No drugs were taken, and no one was seeking to purchase them. Although she had been drinking alcohol, the victim was not intoxicated to the point that she had trouble walking or slurring her words. Ms. Lundahl eventually got onto the stage to sing kar[a]oke. Around midnight, the victim proceeded toward the women's restroom. In the area near the restrooms at Alfred's "[t]here's a doorway you walk in [and] the women's bathroom is to the right [and] the men's [bathroom is] to the left." The area was dark and there was "a little hallway [with] a cigarette machine . . . between the" restroom doorways.

As the victim approached the area, she stopped because she believed that the defendant, whom she did not know, seemed to be saying something to her. She could not hear what the defendant was saying, so the victim leaned forward to hear. At that point, the defendant grabbed the victim and pushed her through the door of the men's restroom and into a stall inside the room. The victim was approximately five feet tall and weighed around 115 pounds. The defendant was six feet, four inches tall and weighed approximately 295 pounds.

The victim was forced into the handicap stall with her body facing the toilet, with the defendant remaining behind her. The defendant ripped her pants down, ripping the zipper and a hole in her pantyhose. Although the victim was pleading with the defendant to stop, he continued and penetrated her vagina and anus. The victim felt the defendant's hands on the back of her neck and head, and she "felt him inside of her." At some point, the victim heard someone begin to beat upon the stall door. [Defendant] stopped his assault at that point, and he exited the stall. The crying victim pulled her pants up and saw the man who had banged on the door. The man did not speak but "indicat[ed] a sort of shhh sign with [his] mouth." The victim stopped crying, and the man walked her to the restroom door. The victim did not know this man

or where he went after she left the restroom. The victim did recall seeing other men in the restroom when she left.

The victim was shocked and scared and did not seek assistance from anyone regarding the rape at that time. She returned to her table and finished her drink. Ms. Lundahl noted a change in the victim's mood upon her return from the restroom. Some time later, the victim asked to leave. At the time the group left Alfred's, the victim had not told anyone that she had been raped.

The group proceeded to a coffee shop called The Map Room. The victim sat with the group, listening to their conversation and drinking coffee. She felt numb, frozen, and did not feel like laughing with her friends. The victim also noted that her rectum was hurting. Ms. Lundahl described the victim during this time as "very blank in the face." The victim and Ms. Lundahl at some point went to the restroom together at The Map Room. The victim urinated, wiped herself, and noticed blood on the tissue, as well as on her clothing. The victim began crying and told Ms. Lundahl what had happened to her at Alfred's. Ms. Lundahl suggested that they call the police or call the victim's boyfriend, but the victim refused to talk to anyone at the time.

Early the next morning, the victim and Ms. Lundahl left The Map Room with Ms. Lundahl's ex-boyfriend and his sister. They returned to the victim's and Ms. Lundahl's residence, arriving at approximately 7:00 a.m. The victim's boyfriend had already gotten her child off to school, and he was not happy that the victim had not called to tell him that she was going to be later than expected in coming home. The victim told her boyfriend nothing about the rape, and, after a short discussion, he left for work. Ms. Lundahl and the two other guests had gone upstairs to her room.

The victim laid down on her bed because she was upset. She eventually got up and removed her clothes, leaving them on the bathroom floor, before dressing in sweatpants and a t-shirt. The victim did not shower, as she knew that rape victims were not supposed to shower afterwards. The victim's boyfriend became concerned that something was wrong with the victim while he was at work. Around 1:00 p.m., he returned home and found the victim "curled up in the bed with a blanket pulled over her, just kind of in a ball laying there . . . ." He asked the victim why she had been out so late the previous evening, and she responded that someone had tried, unsuccessfully, to rape her at Alfred's. He went into the bathroom and saw the victim's clothes on the floor, noticing that

the zipper of the pants and the pantyhose were ripped. He again asked the victim what had happened, and she told him that she had in fact been raped by an unknown black man at Alfred's.

At this point, the victim still did not want to call the police. Instead she went to her gynecologist. However, the doctor refused to see her as the office was not set up to deal with rape kits. The victim's boyfriend also called a doctor friend to see the victim, but he was told that the victim needed to go to the Rape Crisis Center. Her boyfriend took the victim to the center where she was examined. She provided details about the rape, as well as about past sexual abuse. Specifically, she told the examiner that when she was between ten and twelve, on multiple occasions, she was sexually abused by her mother's best friend's dad. She recalled that after each instance, she would return to the living room as if nothing had occurred. The victim did not ever ask anyone for help.

During the examination, Nina Sublette, a family nurse practitioner, observed several acute injuries on the victim's anus, one of which was still bleeding. Ms. Sublette believed that the manner of the injury was consistent with the victim's statement that she had been raped. In addition to the bleeding laceration, the victim had two other anal injuries and friction injuries. Ms. Sublette collected evidence from inside and outside of the victim's vagina and anus, which she packed in a rape kit and sent for testing.

Following the examination and collection of evidence, the victim spoke with police at the crisis center. She was unable to identify the defendant or give a detailed description. The victim took the clothes she had been wearing at the time of the rape to the center the following day.

The testing done upon the evidence collected revealed semen and sperm in the vaginal smear and semen in the anal swab. A DNA profile based upon the recovered semen was generated and later uploaded into the Tennessee Bureau of Investigation's ("TBI") CODIS system. Years later, Sergeant Stephen Wilkerson was informed that a match to the profile entered in the victim's rape case had been found. He contacted the victim, who was currently living out of state, and she flew to Tennessee to be interviewed. Sgt. Wilkerson also began seeking the defendant, and, upon locating him, executed a DNA search warrant to obtain a saliva sample from him. The sample was sent to the lab for re-testing to ensure an accurate match. The positive match was confirmed.

In 2011, the defendant was indicted by a Shelby County grand jury for one count of aggravated rape. He proceeded to trial in 2012. Prior to the beginning of the trial, the defendant filed a motion requesting that the jury be allowed to travel to the crime scene at Alfred's in order to see the size and dimensions of the restroom. The State protested, arguing that the trip would not assist the jury's determination and would waste both time and resources. The court denied the motion, but noted that the motion could be reconsidered if the issue became important during the presentation of the evidence.

At trial, the State presented multiple witnesses who testified to the above account of the evening and subsequent investigation. Afterwards, the defendant called Brian Bazar, the general manager of Alfred's. He described the layout of the restaurant, including the area surrounding the restrooms. A diagram of the restaurant and recent pictures were shown to the jury to assist them as Mr. Bazar detailed the layout of the area.

The only other witness called by the defense was the defendant himself. He did not deny that he had in fact had sexual relations with the victim in the restroom at Alfred's on the night in question. However, he portrayed the act as consensual between the parties. The defendant testified that, at the time, he was employed in the Community Relations Department with the Memphis Redbirds. He further claimed that, after hours, he also worked with several of the players as a bodyguard. He testified that on the night in question, he had gone to Alfred's with ball players, Jason Karnuth and Keith McDonald, as they often did. He stated that around 12:30 p.m., the victim approached him as he was standing at the bar and asked if he knew where she could get cocaine. According to the defendant, he then asked the victim what she would do for the cocaine, and she responded by inviting him to follow her. The defendant maintained that the victim entered the men's restroom, sat on the toilet, and began performing oral sex on him. He claimed that, after he had achieved an erection, the victim pulled down her pants, put one leg on the toilet set, and they had consensual vaginal intercourse. The defendant denied that he had penetrated the victim's anus. The defendant further testified that the victim never said to stop and was, in fact, "moaning in pleasure." He claimed that he ejaculated on the victim's back. The defendant also testified that two of the baseball players he was with that evening saw what occurred in the stall.

Afterwards, in the defendant's version of events, the victim again asked the defendant about the cocaine. He claimed to have told her that he didn't have any and walked out. He testified that he and his group were

later standing outside of Alfred's when they were approached by the victim and her friends. He claimed that they demanded that the defendant get cocaine for the victim. The defendant testified that a police officer intervened, and the confrontation ended. He claimed to have never seen the victim again.

In rebuttal, the State called three former Memphis Redbird players to the stand, specifically the ones the defendant claimed were present the night of the rape. Each denied that the defendant had ever served as their bodyguard. The players did acknowledge that they knew the defendant and had occasionally gone out with him, but each adamantly testified that they were not with the defendant on the night in question and had never watched him have sexual intercourse in a restroom at Alfred's. Questioning revealed that two of the players were no longer in Memphis when the crime occurred.

*State v. Wright*, No. W2013-00433-CCA-R3-CD, 2014 WL 1168579, at *1-4 (Tenn. Crim. App. Mar. 21, 2014)

*Post-Conviction Hearing*

Eric Hulbert testified that he is a photographer in downtown Memphis, and he knew Defendant from seeing him sing at "Wet Willies," a karaoke bar. Mr. Hulbert recalled a night in April 2002 when he went into the men's restroom at Alfred's night club and heard someone moaning. He said that he stepped up on a toilet, looked over the stall, and saw Defendant and a Caucasian woman having sex. Mr. Hulbert testified that Defendant was standing up, and the woman was bent over, and their pants were down. From his perspective, the act seemed to be consensual, and he did not hear the woman scream or yell for help. He also noted that she did not appear to be restrained. Mr. Hulbert did not see Petitioner and the woman enter the restroom nor did he hear any of their conversations beforehand. He did not hear anything else after he left the men's room, and he left Alfred's and went home. Mr. Hulbert testified that he never heard that Petitioner had been charged with raping the victim. He thought that he was first contacted about the case in 2015 in connection with the post-conviction hearing. He said that he had never heard trial counsel's name.

On cross-examination, Mr. Hulbert testified that he had seen Petitioner singing at Wet Willies approximately six times but they never had any conversation. He said that he did not know Jason Karnuth or Keith McDonald. Mr. Hulbert testified that he did not know the circumstances that brought Petitioner and the woman into the restroom, and he did not know what had been happening in the restroom before he heard the moaning. He said that he watched Petitioner and the woman having sex for two to three minutes, and he did not see anyone else enter the bathroom. Mr. Hulbert agreed that the woman was

- 6 -

much smaller than Petitioner. He did not recall if police attempted to contact him after the incident or if they left a message on his cell phone. Mr. Hulbert testified that he never checked his messages "back then."

When asked by the trial court if watching two people have sex for two to three minutes was "the normal kind of stuff that you do," Mr. Hulbert replied, "No, sir." He told the trial court that the incident happened on a Tuesday in April of 2002, and he did not know Petitioner's name at the time. The prosecutor also asked Mr. Hulbert if being on top of the bathroom stall for two minutes watching two people have sex was normal, and he replied, "I was younger."

Petitioner testified that trial counsel was ineffective for failing to call Eric Hulbert as a witness at trial. He said:

> I know him from - - like when I worked for the Red Birds I was downtown. I lived downtown and my life was downtown, so I saw him in passing all the time. And like he said I sang at Wet Willies every Tuesday, Thursday, and Sunday's like - - so he took pictures across the street from Wet Willies so everybody know they call him "Picture Man."
>
> And like he said, like I didn't know exactly his name but I know that he took pictures and his names and stuff was all down Beale Street. So I know him by when I walked by him I'd say what's up, Picture Man.
>
> And he'll come in there see me singing and what he's referring to when like you say when I sing I'm an entertainer. I don't just sing, I put on a show. That's why it's easy to remember somebody six foot, three-hundred pounds putting on a show.

Petitioner believed that Mr. Hulbert was important to his case because his defense was that the act was consensual, and he knew that Mr. Hulbert saw him having sex in the bathroom stall with the victim. Petitioner claimed that he would not have testified at trial if Mr. Hulbert had been called as a witness. He acknowledged that he had told police that in addition to Mr. Hulbert, three former players for the Memphis Red Birds: Lou Lucca, Keith McDonald, and Jason Karnuth, were also in the bathroom and witnessed him having sex with the victim. He later told police that he was mistaken about Mr. Lucca who was not even in Memphis at the time. At trial, Mr. Lucca, Mr. McDonald, and Mr. Karnuth denied witnessing the incident, which Petitioner said hurt his case. Petitioner testified that Mr. Hulbert left the bathroom before Mr. McDonald and Mr. Karnuth walked in.

Trial counsel testified that she had been practicing criminal law for twenty years, and she had handled between eighty and ninety jury trials. She met with Petitioner

numerous times before trial to discuss his case. Trial counsel testified that she also had co-counsel during trial who sat as "second chair." After speaking with Petitioner, trial counsel developed a defense theory of consensual sex.

Trial counsel testified that Petitioner provided her with a "laundry list of people to contact," including Mr. Hulbert. She noted that since Petitioner was in custody he could not remember names, addresses, and phone numbers. Therefore, she made contact with his family to obtain the information. Her investigator, A.L. Gray, attempted to locate Mr. Hulbert by running searches on "Memphis Light, Gas, and Water, JSS," and criminal records databases. Trial counsel testified that Mr. Gray located Mr. Hulbert at the home of Mr. Hulbert's mother and interviewed him. Trial counsel wanted to subpoena Mr. Hulbert for trial. She testified:

> After I got the investigation, I reviewed it, I sat down and spoke with my investigator because I often rely upon my investigator, what their impressions are about a person, how willing they are to serve as witnesses, and also determine if there's anything they would say that might harm my client's case. So, after speaking with my investigator, I reached out. I made phone calls to Mr. Hulbert, but I was never able to contact him. So, I, once again, asked my investigator to try and reach out again after I was unsuccessful in locating Mr. Hulbert, to reach out again - - but he was also unsuccessful. So, all the prior contact that we had for Mr. Hulbert sort of dried up and he went back to the mother's house in an effort to locate him, but that was also unsuccessful because Mr. Hulbert didn't live with his mother. It just was a catch him at his mom's house kind of thing.

When asked if she would have subpoenaed Mr. Hulbert to court if the investigator had found him, trial counsel testified: "Well, I wanted to talk further with him. I feared that Mr. Hulbert might actually have photographs of the sexual encounter that occurred and I was trying to eliminate that possibility because I didn't want to come up with any evidence that could be used to convict [Petitioner]." Trial counsel acknowledged that a report prepared by her investigator from an interview with Mr. Hulbert on January 3, 2012, indicated that Mr. Hulbert did not take pictures of the incident.

On cross-examination, trial counsel testified that Mr. Gray, was an excellent investigator who was with the Memphis Police Department for more than thirty years, and he had worked there as a homicide detective. Trial counsel said that she attempted to contact Mr. Hulbert after Investigator Gray met with him because she felt that Mr. Hulbert may have been a witness necessary for the defense. She said:

> That's why I tried to call him and talk to him myself. I like to follow up.
> I don't just rely on the investigators reports because, when you have a[n]

investigator talk to you, there's a different story, often, from when the attorney talks to you and asks are you willing to testify to this at trial.

However, trial counsel was unable to reach Mr. Hulbert. She said that she did not attempt to subpoena Mr. Hulbert at that point because her "philosophy is with such a serious case as this, if the witness is not cooperating with me before trial, I will not put a witness on the stand because I don't know which way they are going to land. I don't know if he's going to land for the prosecutor or is he's going to land for the defendant. And I do not put witnesses on the stand that I have not talked to." Trial counsel told the post-conviction court that Petitioner only provided her with Mr. Hulbert's name. Petitioner did not have any other contact information for Mr. Hulbert.

*Analysis*

Petitioner contends that trial counsel was ineffective for failing to call Eric Hulbert as a witness at trial. More specifically he asserts that Mr. Hulbert was a "possible eye witness to the sexual encounter in the bathroom" between Defendant and the victim, and he "could have buttressed [Petitioner's] claims that this was consensual sex."

In a post-conviction proceeding, the burden is on the Petitioner to prove his facts for relief by clear and convincing evidence. T.C.A. § 40-30-110(f); *see Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. *Id.* Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. *Id.* at 457.

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 205, 280 L.Ed. 2d 674 (1984); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard

of reasonableness under prevailing professional norms." *Id.* at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter*, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 370 (quoting *Strickland*, 466 U.S. at 694). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Id.* at 690, 104 S.Ct. at 2066.

To succeed on a claim of ineffective assistance of counsel for failure to call a witness at the trial, a petitioner should present that witness at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "As a general rule, this is the only way the petitioner can establish that . . . the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner." *Id.* Once a petitioner presents a witness at a post-conviction hearing who he claims should have been called at the trial, the post-conviction court must determine whether the testimony would have been (1) admissible at the trial and (2) material to the defense. *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008). The court is justified in finding that counsel was not deficient by failing to call a witness if it determines that the witness's testimony would have been inadmissible at the trial or that, even if admissible, would not have materially aided the petitioner's defense at the trial. *Id.* If the proffered testimony is both admissible and material, the post-conviction court must access the credibility of the witness. *Id.* at 869-70.

Concerning trial counsel's failure to call Mr. Hulbert as a witness, the post-conviction court found:

> [Trial counsel] made every effort to locate Mr. Hulbert prior to trial as she wanted to speak to him personally before calling him as a witness. She also testified that both she and her investigator were unable to get in touch with Mr. Hulbert, and that the one contact her investigator had with him was an instance when he got lucky and caught Mr. Hulbert visiting his mother's house. To prevail on an ineffective assistance of counsel claim with regard to the failure to subpoena or produce a potential witness, the defendant must (1) produce the witness at the post-conviction hearing, (2) *show that trial counsel could have located the witness*, and (3) elicit both favorable and material testimony from the witness. *Denton v. State*, 945 S.W.2d 793, 802-803 (Tenn. Crim. App.

- 10 -

1996)(emphasis supplied). Petitioner gave his attorney no address or phone number for Mr. Hulbert. [Trial counsel] and her investigator made extensive efforts to try to track down Mr. Hulbert, but could not do so after the one lucky encounter with him. In the post-conviction evidentiary hearing, Petitioner failed to show that Mr. Hulbert could have been located for the trial. Petitioner has failed to show "deficient performance" for two reasons. First, he has failed to show that the witness could have been located or that counsel's actions in trying to locate the witness fell below the standard level of competence required of attorneys in criminal cases. Second, [trial counsel's] decision not to utilize a witness without having first talked to that witness is a tactical decision. Petitioner has failed to show that this "tactical decision" fell below an objective standard of reasonableness and outside the wide range of reasonable professional assistance considering all the facts and circumstance of the present case. Petitioner has failed to establish "deficient performance."

In addition, Petitioner has failed to establish "prejudice." Under the particular facts and circumstances of the present case there is no "reasonable probability" the additional testimony of Mr. Hulbert would have altered the outcome of the case. Petitioner contended at trial that he had consensual vaginal sex with the victim in the bathroom of Alfred's. He specifically denied any penetration of the victim's anus. On the other hand, the victim testified as to both non-consensual vaginal and anal penetration. Significantly, the victim's version of the sexual penetration was corroborated as semen was found in the victim's anus and an examination revealed recent injuries to her anus. In addition, the proof adduced during the trial indicated that the Petitioner at one time had told the police that a Memphis Redbird, Lou Luc[c]a, had also witnessed the consensual sex in the bathroom as well as the confrontation outside the nightclub. Significantly, Mr. Luc[c]a testified at the trial that he was not on the Redbirds roster at the time of this incident and not in Memphis. Accordingly, the proof was such as to justify a conclusion that the Petitioner had lied in his efforts to manufacture a witness to corroborate his story. Furthermore, Petitioner also named Jason Karnuth and Keith McDonald as ballplayers who also witnessed the consensual sex in the bathroom. Both testified at trial that they did not witness any such incident. They also both testified that Petitioner was not a "bodyguard" with the Redbirds as he had boasted in his testimony and that he was a mere "intern" with the organization.

When you consider that fact that it was abundantly clear to the jury that Petitioner was willing to "manufacture" witnesses to the event and the

fact that he had a problem with the conflicting scientific testimony as to anal penetration, Mr. Hulbert's testimony would not have made a difference for several reasons. First, Mr. Hulbert testified in the post-conviction evidentiary hearing that no one else was in the bathroom when he observed the sex. This contradicts Petitioner's allegation that ballplayers Karnuth and McDonald witnessed the incident. If Hulbert's testimony is taken as true, this corroborates the testimony of Karnuth and McDonald that they did not witness the event and it became clear that Petitioner manufactured three witnesses to the event. Second, Mr. Hulbert testified in the post-conviction evidentiary hearing that he never heard about Petitioner being charged with rape until being subpoenaed for the post-conviction case, a fact that is obviously not true as he was spoken to on one occasion by the public defender investigator.

Simply put, at the trial of this case, the victim's testimony was credible and believed by the jury and by this court. On the other hand, Defendant had problems with the scientific evidence not corroborating his claim of only vaginal penetration; and it appeared as though he was lying as to witnesses who could back up his story. There is no reasonable probability that Mr. Hulbert's testimony would not [sic] have changed the outcome.

The record supports the post-conviction court's findings. Trial counsel made a strategic decision not to call Mr. Hulbert as a witness. Trial counsel testified that Petitioner did not provide her with any contact information for Mr. Hulbert, and her investigator, Mr. Gray, happened to find Mr. Hulbert on one occasion at his mother's house, and Mr. Gray interviewed him. Trial counsel explained that it was her practice to personally interview witnesses before calling them to testify at trial. She said, "I like to follow up. I don't just rely on the investigators reports, because, when you have a[n] investigator talk to you, there's a different story, often from when the attorney talks to you and asks are you willing to testify to this at trial." Trial counsel made attempts to locate Mr. Hulbert to talk to him face to face but she was unable to do so, and her investigator was also unable to locate Mr. Hulbert a second time. Because trial counsel's decision not to subpoena Mr. Hulbert as a witness was based on the unsuccessful attempts to locate him and to interview him, trial counsel's strategic decision is entitled to deference. Obviously, without an address, a subpoena would be useless. A lawyer's decision to personally evaluate both the content of the possible testimony and the credibility of a witness before calling a witness to testify is a classic example of a proper tactical decision. Trial counsel's performance in this area was not deficient, and Petitioner is not entitled to relief on this issue.

Having concluded that the post-conviction court was correct in concluding that Petitioner failed to prove deficient performance by his trial counsel, there is no need to address the prejudice prong. *Goad*, 938 S.W.2d at 370.

## CONCLUSION

Based upon consideration of the foregoing and the record as a whole, the post-conviction court's denial of the petition for post-conviction relief is affirmed.

_____
THOMAS T. WOODALL, PRESIDING JUDGE