IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs December 4, 2018

**JERALD JEFFERSON v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
No. 11-05625          Lee V. Coffee, Judge

_____

**No. W2018-00440-CCA-R3-PC**
_____

Jerald Jefferson, Petitioner, was convicted of aggravated rape and sentenced to twenty-five years' incarceration and his conviction was affirmed on direct appeal. His petition for post-conviction relief was denied by the post-conviction court after a hearing. On appeal, Petitioner claims that he was denied effective assistance of counsel because trial counsel failed to file a motion pursuant to Tennessee Rule of Evidence 412 to allow cross-examination of the victim about an alleged consensual sexual encounter between the victim and Petitioner. After a thorough review of the facts and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

Genna M. Lutz, Memphis, Tennessee, for the appellant, Jerald Jefferson.

Herbert H. Slatery III, Attorney General and Reporter; Robert W. Wilson, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Alanda Dwyer, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

This court summarized the facts in Petitioner's direct appeal opinion as follows:

The victim in this matter reported to police officers in 2002 that she had been raped. At the time, she was a sixteen-year-old high school student. A DNA sample was taken from her, but the matter was dormant until 2010, when a DNA sample taken from [Petitioner] was determined to match the sample taken from the victim in 2002. He was indicted for aggravated rape in 2011 and convicted of this offense.

. . . .

The State's first witness was Memphis Police Officer Raymond Anthony Owens, who testified that, on October 4, 2002, he received a call from the dispatcher to go to a business address on Elvis Presley Boulevard. When he arrived, an EMS technician was completing an examination of the victim. Officer Owens described the victim as having "clothing [that] was in disarray. Her hair was kind of messed up. She was upset, crying." She told him what had happened:

> She said she was in front of Trezevant High School. Somebody came up behind her, put something over her head, put her inside of a vehicle. She thinks there w[ere] about three attackers. And while they drove around, they sexually assaulted her. They held her down and sexually assaulted her.

Officer Owens then transferred the victim to the rape crisis center, where she was examined and a DNA sample was taken.

The victim's mother next testified, saying that the victim was the middle of three daughters. In 2002, the victim attended Trezevant High School, where she was on the track team and played volleyball, as well as the clarinet and the drum for the school band. She was a "good child" and "as far as being a liar or giving . . . a lot of trouble, she didn't do that." On October 4, 2002, the victim was to call from school when she was ready to be picked up and brought home. Around 3:00 p.m. that day, the witness received a telephone call from McClain Motors on Elvis Presley Boulevard, telling her that the victim "was there and she had been hurt." The victim had called her stepfather, and he and her mother went to McClain Motors. When they arrived, the victim was "hysterical." Her mother further described her condition:

I don't think she had on a shirt. I know she didn't have on shoes. Her hair was pulled—like it had been in a ponytail, so pulled—she was in bad shape. She was in bad shape.

. . . .

She wasn't physically . . . beaten, no. Crying. Hysterical, really. It was . . . bad. If you seen [sic] your child like this, you would understand. It was bad.

The victim testified that, at the time of trial, eleven years after the rape, she was twenty-seven years old, working as a security officer, and living with her parents. She had graduated both from high school and Southwest Tennessee Community College. She said that, on October 4, 2002, she had been at school and was leaving to return home, as her mother had instructed, when she heard a person she knew as "Antonio" call her name. She described what happened next:

So I walked over, and then the next thing you know, there was a bag being put on my head, and people were pulling me, and I was hearing yelling, and I was yelling, and I was drug [sic] into the car.

We rolled around for a long time, you know. If your head is covered, it can only be a long time, you know. So we drove around and drove around and drove around. And I heard whispering. And we pulled over somewhere, and I can remember them snatching my clothes off. I can remember people holding me down. I can remember me screaming, "Stop it. No. What are you doing? Let me go." I'm blind, so I can't see without my glasses. I can remember them taking everything that I had.

When they finally finished, they never said anything to me. And they let me out and . . . everything in me was gone. And I was scared. And I called my dad. And he told me to call Mom. And I called Mom. And then everybody came.

The victim said that there were three men in the car, including Antonio. Otherwise, she was unable to describe them. She remembered the men grabbing her arms and legs, holding a bag on her head, and "being in the back seat on [her] back." The car stopped, and she was raped. The car door then opened, and she was pushed out. She walked to McClain Motors, where she was helped and her mother and father were called, as well as an ambulance. Her parents arrived, and she later went to the rape crisis center, where she was examined.

Kevin McClain testified that he was the owner of McClain Motors and, when the victim walked in, she was not wearing shoes, looked "dazed and confused," and said that she had been raped. He telephoned the police department but did not ask the victim what had happened.

Judy Pinson testified that she was a nurse practitioner at the Memphis Rape Crisis Center. She said the victim had been examined at the Center in 2002, and a sub-acute abrasion about one centimeter in length was found on her vulva. Pinson believed it to be a penetrating injury. Pinson took DNA samples from the victim.

Lieutenant Stephen Cody Wilkerson testified that he was employed by the Memphis Police Department and was in charge of the Sex Crimes Cold Case Unit. On January 3, 2011, he was assigned to work on the victim's case, and there had been a match made with the DNA from the victim's rape kit and a Tennessee Bureau of Investigation ("TBI") profile of DNA taken from [Petitioner]. [Petitioner] was contacted and voluntarily came to police headquarters. He was not arrested but was advised of his *Miranda* rights before being questioned. [Petitioner] consented to having another DNA sample taken from him. [Petitioner] responded to questions asked of him, and Lieutenant Wilkerson described [Petitioner]'s actions when told of the DNA evidence:

> [U]p to that point, he was a little nervous, but he was engaged in conversation. He would look at me, he'd make eye contact with me, he would answer questions, . . . he asked a couple of questions.
>
> Once . . . I told him that we had recovered DNA evidence from the rape kit that was collected after [the

victim] was assaulted and taken to Rape Crisis, I told him that we recovered his DNA from inside her vagina.

At that point, he just stopped talking. He just looked down at the floor, wouldn't say a word, wouldn't move. We sat there for a long time. We were in the interview room for about an hour and twenty minutes. Probably the last twenty minutes was just sitting there with him staring at the floor.

Lieutenant Wilkerson continued that his reason in asking for a second DNA sample from [Petitioner] was for a confirmatory test. Since the results from the second test were not yet available, [Petitioner] was allowed to leave following his being questioned.

Deanna Lankford testified that she was employed as Associate Laboratory Director for Cellmark Forensics, a private forensic DNA testing laboratory. She said that she had testified as a DNA expert witness "[c]lose to" fifty times in criminal, federal, and military courts, in "many different states." She said that she had received slides prepared with samples taken from the victim's sexual assault kit and that the presence of semen was detected. As a result of the testing, a DNA profile was created and returned to the TBI in 2005.

Lawrence James testified that he was employed by the TBI as a special agent and forensic scientist supervisor. He said that he had provided expert testimony in courts regarding DNA approximately seventy-five times. The DNA profile from Cellmark had been uploaded into CODIS in 2006, and, in November 2010, he was told that the profile matched that of [Petitioner]. This result was reported to Shelby County authorities, and the TBI asked that, for confirmation purposes, a second DNA sample be taken from [Petitioner]. Special Agent James then received and tested this second sample and concluded that the DNA from [Petitioner]'s second swab matched that found on the vaginal swab from the victim's rape kit. He said that among African-Americans, the race of [Petitioner], he would expect to see this profile once in 40 quadrillion, 870 trillion. The State then rested its case.

Following this testimony, [Petitioner] rested without presenting any evidence.

*State v. Jerald Jefferson*, No. W2014-00784-CCA-R3-CD, 2015 WL 3932448, at *1-5 (Tenn. Crim. App. June 25, 2015), *perm. app. denied* (Tenn. Oct. 15, 2015).[1] This court affirmed Petitioner's conviction for aggravated rape, and the Tennessee Supreme Court denied further review. *Id.*

## Petition for Post-Conviction Relief

Petitioner filed a timely post-conviction petition, claiming that he received the ineffective assistance of counsel and that there was newly discovered evidence.[2] Following the appointment of counsel, an amended petition was filed, claiming that Petitioner received ineffective assistance of counsel based on six deficiencies, only one of which was raised in this appeal: whether trial counsel was ineffective in failing to file a motion pursuant to Tennessee Rule of Evidence 412, which is sometimes referred to as the rape shield law. Accordingly, we will limit our summary to the evidence presented at the post-conviction hearing related to the sole issue raised on appeal.

## Post-Conviction Hearing

At the beginning of the hearing, post-conviction counsel announced that he had subpoenaed Antonio Starks as a witness. Mr. Starks, who was incarcerated on a life sentence for first degree murder at the time of Petitioner's trial and the post-conviction hearing, asserted his Fifth Amendment right to remain silent to avoid possible self-incrimination. Mr. Starks was identified by the victim in her statements to police and in her testimony during Petitioner's trial as one of the individuals who abducted and raped her. The State announced that it made the decision not to prosecute Mr. Starks in the rape case because he was "already serving a life sentence." The post-conviction court released Mr. Starks from the subpoena and ordered him to be returned to the custody of the Tennessee Department of Correction.

Petitioner testified that his family hired trial counsel. He claimed that he rarely saw counsel and that he only met with him three times for about ten minutes each visit. Petitioner claimed he met the victim "on a chat line" and that a week later they "ended up hooking up." He claimed the victim told him she was eighteen and had graduated from

---

[1] We note that this case was designated "not for citation" by our supreme court. "An opinion so designated shall not be . . . cited by any judge in any trial or appellate court decision . . . except when . . . the opinion is relevant to a criminal, post-conviction or habeas corpus action involving the same defendant." Tenn. Sup. Ct. R. 4(E)(2).

[2] The original petition was filed by Marie A. Williams as "next friend" for Petitioner. In Ms. Williams' affidavit, she affirmed she was Petitioner's aunt and claimed that Petitioner had memory loss as the result of a head injury he sustained from a car wreck in 2006.

Trezevant High School but that she was going back to the school "to help with some after-school activities." He picked up the victim after school to "hang out" and drove the victim to Melvin Jefferson's house on Gwynne Street. Although Petitioner could not remember the exact date, he said he thought it occurred in the fall of 2002. He claimed that he and the victim "ended up having sex[,]" and afterwards, he got a phone call from some "buddies that [he] was in a dance group with," so he left without telling the victim. He never saw the victim again. Petitioner stated that Melvin Jefferson and his sister, Monique Jefferson, were at the house on Gwynne Street when he and the victim had sex. He claimed that he provided this information to trial counsel.

Petitioner stated that, when he was first arrested, he did not know the identity of his accuser. He said he "put two and two together" after reading in the discovery package that the event happened on Gwynne Street after the victim was involved in "after-school activities that she said that she went back to the school to help out with[.]" He claimed he did not know the victim's identity "for sure till [sic] it was time to come to trial and [he] s[aw] her face." He said that he had never seen Mr. Starks before the post-conviction hearing. He also claimed that the 2006 accident did not affect his memory of the events in 2002.

On cross-examination, Petitioner admitted that he had twenty to twenty-five court dates before his trial and that he talked to trial counsel on some of those dates. He admitted to having experience in court proceedings based on thirteen prior felony convictions. He stated that he had attended college for a year and a half.

On examination by the court, Petitioner stated that, when he was initially questioned by the police, he stated that he "knew a bunch of" girls with the victim's first name but that he did not know if he knew the victim. He claimed he initially denied having sexual intercourse with the victim because he was not sure of her identity. He agreed that, when initially confronted with the DNA evidence, he did not say anything to the police about a consensual sexual encounter.

Trial counsel testified that he had been practicing law for twenty-six years and had handled "hundreds" of jury trials. He said this case was difficult because Petitioner had suffered a bad car accident in 2006 and that, in 2011, Petitioner "did not have a clear memory of any of the events that took place" in 2002. He stated that Petitioner talked about the accident "in great detail, and he was using that, basically, to say, 'I don't remember.'" Trial counsel had multiple mental evaluations of Petitioner, but each evaluation found him competent to stand trial. He said the State's first offer was fifteen years and that the second offer was for twelve years. He claimed that he did not have a "basis, other than these speculations, for filing a 412 motion," explaining:

- 7 -

[W]hen [Petitioner] actually saw the victim, and he heard from the victim, that's about when he told me that he did remember her, and that he had had sex with her, and the biggest problem now was that, since she had been sixteen at the time, if he admitted that he had actually had sexual relations with her, consensual or otherwise, he was walking himself straight into a statutory rape situation. That's what happened.

And, by this point in time, since we're already in the trial when we learn this, we are foreclosed in going down the [] Rule 412[,] route, because you're supposed to file that ten days prior to trial, in order to avail yourself of what the statute says, and how you conduct an investigation of a victim and get into her prior sexual history.

So, the problem we had was that [Petitioner] was now firmly caught on the horns of a dilemma. And, of course, I think, to make a point about what he said earlier about testifying or not testifying in his defense, if I remember correctly, the conversation that we had at the close of the state's case-in-chief, and his decision whether or not to get up on the stand, I did point out to him the problem that he was going to face if he got up on the stand and made a statement such as he was planning on doing, and admitting that he was guilty of statutory rape in the middle of an aggravated rape trial.

. . . .

That's when he came up with the idea that he had been in a consensual sexual relationship with the young lady--that they had met online. He mentioned that in trial. It wasn't before trial, I know that.

Because, obviously, if he had mentioned that before trial, it would have made perfect sense to go ahead and file a 412 and attack the credibility of the witness/victim. But we didn't get to that point because, either he didn't remember, or -- and, genuinely, maybe he did not recognize her until she came into the courtroom.[3]

---

[3] We take judicial notice of the record in Petitioner's direct appeal which contains the trial transcript. The first sentence of the transcript was a question by the court: "Yes, sir, [trial counsel]. You had indicated that [Petitioner]'s defense in this case will be one of consent?" Trial counsel responded "Correct." This dialogue occurred before voir dire of the jury, which was contained in the first two volumes of the transcript. The record does not contain a transcript of any hearing that occurred before the court's question concerning consent. The technical record contains a copy of the "State's Motion in Limine to Exclude Reference to Victim's Sexual Behavior Pursuant to Tennessee Rule of Evidence 412"

Trial counsel agreed "that there were three people involved in this offense" and that one of them was Mr. Starks. Trial counsel also agreed that he knew from discovery that the rape kit results showed that there was sperm from more than one individual. He stated that Petitioner never mentioned Melvin and Monique Jefferson before trial. Counsel agreed that a consensual act "was not consistent with what the victim reported and what the people that found her after this incident reported."

On cross-examination, trial counsel admitted that he learned through discovery that the victim reported that she had been "summoned to the vehicle by an acquaintance that she knew, Antonio Starks[.]" He also agreed that the victim testified at trial "that she was approached from behind, and a cloth bag was put over her head, and that she was dragged into a car[.]" He agreed that he tried to cross-examine the victim's mother about whether the victim "had planned to meet up with Antonio Starks," but the State's objection to that line of questioning was sustained. He again reaffirmed that he did not file a Rule 412 motion before trial because Petitioner stated that he did not know the victim. Post-conviction counsel then attempted to question trial counsel as to his reason for not filing a Rule 412 motion since trial counsel knew that the victim had identified Mr. Starks. The State objected on the grounds of relevancy and the post-conviction court stated that his trial notes showed that "we had a jury-out hearing. We looked into all of this. There was never a question as to whether or not the victim in this case knew Antonio Starks." The court then allowed post-conviction counsel to proceed with this line of questioning, but the cross-examination turned to questions about the DNA results.

At the conclusion of the hearing, the post-conviction court made an oral ruling. The court found that there was a "stark difference" in Petitioner at the post-conviction hearing and Petitioner at the trial, stating that at the trial Petitioner could not remember "what could have happened, what did happen, what didn't happen." The post-conviction court described Petitioner at trial as being "basically in a comatose state[,] very lethargic, very incommunicable[,]" stating that when the court tried "to have conversations with [Petitioner], it was like talking to a zombie." The court noted that Petitioner "was very articulate, very well-spoken, [and a] very smart person" at the post-conviction hearing. The court found that "for the time this case has been pending in this court, [Petitioner] has been playing games with his trial lawyer. He's been playing games with this Court." The court found Petitioner to be "a very dishonest person" and found that he "lied to the Court today, or he lied during his *Momon* hearing." The court accredited the testimony

filed on the first day of trial. Volume three of the transcript begins with a statement of the court reporter noting that "[t]he following proceedings were held out of the presence of the jury[.]" The jury-out proceeding occurred before the jury was sworn, the proceeding was not further described, and no transcript was filed in the record. In the opening statement, trial counsel said that "the person who attacked [the victim], if indeed she was attacked, was someone other than [Petitioner].

of trial counsel and discredited "everything that came out of [Petitioner's] mouth[.]" In characterizing the evidence at trial, the court noted that the victim

> [w]ent over to the car, was grabbed by these folks. Had a bag placed over her head[,] was driven from Trezevant High School to somewhere in south Memphis[,] was raped repeatedly by at least two different people, probably three people, and that's the mixture, the DNA profile mixture, that was found in this rape kit that was conducted on this sixteen-year-old child. Raped repeatedly by two or three people.

The court noted that the DNA expert testified at trial that the statistical chance that another individual's DNA would match the DNA sample taken from the victim that was identified as Petitioner's was "one out of one hundred and twenty-seven quadrillion." The court also noted that even though [trial counsel] "did not file a 412 motion, we did conduct an impromptu [Rule] 412 hearing outside of the presence of the jury, so that [trial counsel] could make that record." Concerning the failure to file a Rule 412 motion based on the information known to trial counsel concerning Mr. Starks, the court stated:

> Antonio Starks, for the record, is a smokescreen. Antonio Starks may have very well, and probably did, engage in unlawful sexual intercourse with this young lady. Antonio Starks is serving a life sentence for murder right now. The State of Tennessee made a decision not to charge Antonio Starks, because he's serving a life sentence[.]

The post-conviction court concluded that "[t]here [wa]s no basis for [trial counsel] to have filed a frivolous [Rule 412] motion" and denied the petition for post-conviction relief.

### Written Order Denying Petition

On February 5, 2018, the post-conviction court entered a twenty-seven page written order, addressing each of the claims made in the petition and the amended petition and denying relief. The court found that trial counsel had practiced for twenty-five years and had handled hundreds of jury trials. The court noted that trial counsel believed there was no basis for a Rule 412 Motion until Petitioner mentioned alleged consensual sex with the victim for the first time at trial and that allegations of consensual sex would have been inconsistent with the facts known to trial counsel.

The post-conviction court accredited trial counsel's testimony that Petitioner never informed him that Melvin and Monique Jefferson were possible witnesses to a consensual sexual encounter. The court noted that Petitioner failed to call Melvin and Monique

Jefferson as witnesses at the post-conviction hearing and that it could not "speculate on what benefit the witnesses might have offered" to Petitioner's case or "how any additional witnesses could have made a difference in the outcome of this trial."

The post-conviction court found that trial counsel "had no basis to argue and present an untimely and unfounded Rule 412 motion regarding alleged consensual sexual intercourse with the child victim in this case." The court noted Petitioner "had always insisted that he had never met the victim and had never engaged in sexual intercourse with the victim—until the midst of the trial." The court noted that, when Petitioner first claimed that he had a consensual sexual encounter with the victim, he "was afforded a hearing outside the presence of the jury to develop this issue" and that trial counsel "withdrew the unfounded inquiry when the victim testified that she had never met [] Petitioner and could not identify or recognize [] Petitioner in court." Concerning the claim that trial counsel was ineffective for failing to file a Rule 412 motion, the court found that "Petitioner has wholly failed to present any proof to substantiate this farcical allegation. This issue is without merit." The court repeated its oral credibility findings, stating that "Petitioner's testimony at the evidentiary post-conviction hearing [was] not credible" and accrediting the testimony of trial counsel.

Petitioner now timely appeals from the denial of post-conviction relief.

## Standard of Review

A petitioner seeking post-conviction relief has the burden to prove all factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The post-conviction court's "findings of fact . . . are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence in the record preponderates against those findings." *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999), *on reh'g* (Tenn. Mar. 30, 2000); *see also Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). The credibility of the witnesses and the weight and value to be given their testimony are to be resolved by the post-conviction court. *Fields v. State,* 40 S.W.3d 450, 456 (Tenn. 2001); *see also Pylant v. State*, 263 S.W.3d 854, 869-70 (Tenn. 2008). Appellate "review of legal issues or mixed questions of law and fact, such as a claim of ineffective assistance of counsel, however, is de novo with no presumption of correctness." *Id.* at 867-68.

## Analysis

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the

deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

Petitioner contends that trial counsel's performance was deficient based on his failure to timely file a Rule 412 motion. In his contradictory post-conviction testimony, Petitioner claimed that he discovered the victim's identity through discovery and that he informed trial counsel that he had a consensual sexual encounter with the victim. He also claimed that he did not know the identity of the victim for certain until he saw her at trial. He claimed that he provided to trial counsel the names of witnesses who were at the home where the alleged consensual sexual encounter occurred, and therefore, trial counsel should have filed a Rule 412 motion. As the post-conviction court noted in its written order, Petitioner failed to call those witnesses during the post-conviction hearing,

and without their testimony at the post-conviction hearing, the court "cannot speculate on what benefit the witnesses might have offered" to Petitioner's trial or to his post-conviction claim concerning the failure to file a Rule 412 motion. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

Trial counsel testified that Petitioner "came up with the idea that he had been in a consensual sexual relationship" with the victim when he saw the victim at trial. He claimed that Petitioner never told him about a consensual sexual encounter before trial and that, "if [Petitioner] had mentioned that before trial, it would have made perfect sense to go ahead and file a [Rule] 412 [motion]."

Concerning the failure to file a Rule 412 motion, the post-conviction court wrote in its order that the post-conviction court found that trial counsel "had no basis to argue and present an untimely and unfounded Rule 412 motion regarding alleged consensual sexual intercourse with the child victim in this case." The court noted that Petitioner "had always insisted that he had never met the victim and had never engaged in sexual intercourse with the victim—until the midst of the trial."

During cross-examination of the victim at trial, counsel attempted to question the victim about her sexual activity. Following an objection by the State, trial counsel indicated during a jury-out hearing that the victim stated on direct examination that she was sexually active. The State responded that the victim actually testified that "the detective didn't believe her and thought she was not a virgin." The trial court sustained the State's objection to that line of questioning.

We agree with the post-conviction court's finding that the proof at trial was overwhelming. DNA evidence taken shortly after the victim was found at McClain Motors linked Petitioner and at least one other individual to a sexual encounter with the victim. The victim's statements to police and her testimony at trial that she was raped, was corroborated by the testimony of witnesses who saw the victim shortly after the rape and by the medical proof. The post-conviction court assessed the testimony of Petitioner and determined that he was not credible. The court found trial counsel credible. Petitioner has failed to show that counsel performed deficiently by failing to file a Rule 412 motion. Even if counsel's performance was somehow deficient, Petitioner has failed to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687.

**Conclusion**

The judgment of the post-conviction court is affirmed.

_____
ROBERT L. HOLLOWAY, JR., JUDGE